## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ALLEGHENY CASUALTY COMPANY,
      Plaintiff,

v.                                                              Case No: 8:13-cv-128-SCB-TGW

ARCHER-WESTERN/DEMARIA                    **DISPOSITIVE MOTION**
JOINT VENTURE III, AW WESTERN
CONTRACTORS, LLC and
DEMARIA BUILDING COMPANY,

      Defendants.
_____

### ALLEGHENY CASUALTY COMPANY'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiff ALLEGHENY CASUALTY COMPANY ("ACC"), pursuant to Rule 56 of the

Federal Rules of Civil Procedure and Local Rule 3.01, prays for the entry of summary judgment

in this consolidated action in favor of ACC as to Counts I, II, III and IV of ACC's Amended

Complaint and dismissing the Complaint of Defendants ARCHER-WESTERN/DEMARIA

JOINT VENTURE III, ARCHER WESTERN CONTRACTORS, LLC and DEMARIA

BUILDING COMPANY ("AW").[1]

### SUMMARY OF RELIEF REQUESTED

This Motion addresses two issues:

1.      AW induced ACC to issue the Performance and Payment Bonds at issue in this

case through a scheme of fraudulent concealment and intentional misrepresentation.  Thus, ACC

is entitled as a matter of law to void and rescind the Bonds and to recover all amounts ACC

expended as a result of issuing the Bonds. AW's Complaint must be dismissed because the

_____

[1] ACC and AW both have proposed Amended Complaints pending before the Court. As the Court has not yet ruled on the proposed amendments, this Motion appropriately only addresses ACC's and AW's complaints as originally filed in this action. *See* Pl. Ex. A ("ACC Complaint") and Pl. Ex. B ("AW Complaint") attached hereto.

Bonds are unenforceable. Alternatively, ACC is entitled to recover damages in tort against AW for its intentional misrepresentation.

2.      If, and only if, this Court does not grant rescission of the Bonds, ACC's liability to AW is limited to the penal sum of the Performance Bond. ACC already has exceeded the penal sum limit, and AW's Complaint against the Bond must be dismissed.

**STANDARD OF LAW**

"Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact . . . the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Gallina v. Commerce & Indus. Ins.*, 2008 U.S. Dist. LEXIS 75676 at *12-13 (M.D. Fla. Sep. 30, 2008) ((*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 323-24 (1986); Fed. R. Civ. P. 56)) (granting summary judgment and declaring contract void due to misrepresentation).

**I.      ISSUE I:  AW'S FRAUDULENT MISREPRESENTATION**

      **A.      STATEMENT OF MATERIAL UNDISPUTED FACTS**

            *1.      The Parties, the Project, and Relevant Witnesses*

1.      This case arises from the construction of the United States Department of Veteran's Affairs ("VA") Tampa Polytrauma Project #673CA2500B (the "Project").

2.      AW-WESTERN/DEMARIA JOINT VENTURE III was the general contractor for the project.  The members of AW-WESTERN/DEMARIA JOINT VENTURE III are AW

WESTERN CONTRACTORS, LLC and DEMARIA BUILDING COMPANY, INC.  (Pl. Ex. A ¶ 2, Pl. Ex. B ¶ 2). The Defendants collectively are referred to herein as "AW".

3.     AW entered into a Subcontract with United Construction of Central Florida, Inc. ("United"), Subcontract #210048S13 (the "United Subcontract") for United to furnish labor and materials related to the interior drywall portion of the Project.  (Ex. 2).

4.     Randy Moon was AW's Project Manager and had the highest authority on the Project. (Moon Dep. 9:1-5).

5.     James Reichart is Vice President/Director of Healthcare of AW and was Randy Moon's supervisor with regard to the Project. (Reichart Dep. 6:7-13; Moon Dep. 19:24-20:5).

6.     Andrew Kocher is another AW Project Manager who assisted Randy Moon in evaluating the drywall subcontract bids and buying out the drywall subcontract for the Project. (Moon Dep. 36:19-20; 37:6-14; 50:14-20).

7.     Jim Panozzo is AW's Comptroller. (Moon Dep. 59:24 – 60:7).

8.     Tim Gerken is AW's Chief Financial Officer. (Reichart Dep. 74:21-22).

9.     ALLEGHENY CASUALTY COMPANY ("ACC") is engaged in the business of issuing surety bonds, including construction payment and performance Bonds.  ACC is licensed and authorized to do business in the State of Florida.  (Pl. Ex. A ¶ 1; Silverstein Aff. ¶ 3).

10.     ACC issued Payment and Performance Bonds on behalf of United with regard to the Project ("Payment" or "Performance Bond" or the "United Bonds"). (Ex. 37, Ex. 38).

11.     Greg Parrish was the ACC Regional Manager, and the Tampa Metropolitan Area fell within his region. Mr. Parrish was primarily involved in underwriting the United Bonds. (Parrish Dep. 13:7-11; Silverstein Aff. ¶ 5).

<u>        2.        *AW's Award of the Project and Drywall Buyout*        </u>

12.        On March 19, 2010, AW submitted a proposal to the VA under Solicitation No. VA-101-RP-0026 to complete the Project for $52,175,000.00. (Pl. Ex. C).

13.        In preparing its proposal to the VA, AW requested quotes from various drywall subcontractors for the cost to complete the drywall portion of the Project. AW received quotes from at least nine subcontractors ranging in price from $2,625,684.00 to $4,593,704.27. (Moon Ex. 33; Moon Dep. 51:21-52:2).

14.        AW used an estimate of $2,625,684.00 for the drywall work in preparing its final overall Project bid price to the VA of $52,175,000. (Ex. 94).

15.        James Reichart reviewed and determined the amount for drywall work that AW included in its bid to the VA. (Reichart Dep. 15:24 - 16:15). Mr. Reichart also approved the final overall Project bid that AW submitted to the VA. (Reichart Dep. 15:6-8).

16.        On April 30, 2010, the VA awarded the Project Contract VA101CFM-C-0085 to AW in the amount of $52,175,000. (Pl. Ex. C.)

17.        After award of the overall Project, AW began the buyout process of awarding subcontracts. (Moon Dep. 37:8-23).

18.        During the buyout phase, AW received the following bids for the drywall work:

Wall Systems   $2,385,000

Kirkwood        $2,228,400

United            $1,665,000

(Moon Ex. 32; Moon Dep. 48:9 - 50:7, 53:18-21).

19.        United's bid was 25 to 30 percent lower than the next lowest drywall bid. (Moon Dep. 40:21-22; Reichart Dep. 66:25 – 67:4).

4

20.     By comparison, United's bid was nearly $1 Million lower than the amount AW had estimated for drywall work in preparing its bid to the VA (Reichart Dep. 51:3-18).

21.     When AW buys out a trade at an amount lower than the price included in its bid, the cost savings are placed in a contingency fund and, ultimately, may become profit (also known as fee). (Reichart Dep. 31:20 - 32:5; 33:3-13).

22.     The AW project management team, including James Reichart, Randy Moon, and others, received bonuses based upon the profitability of the Project. (Reichart Dep. 29:15 - 31:7).

23.     Andrew Kocher reviewed the drywall bid submissions with Randy Moon. (Moon Dep. 37:24-38:3).

24.     Andrew Kocher sought the opinion of AW's Comptroller, Jim Panozzo, regarding United's financials and whether United was capable from a "cash flow" standpoint to be awarded the subcontract. Mr. Panozzo responded on July 27, 2010: "I have a few concerns with this company. . . . *If you do write them a contract I would definitely have it bonded.*" (Ex. 34).

25.     On August 13, 2010, AW notified United that United had been selected as the drywall subcontractor for $1,665,000. (Ex. 99).

26.     Before AW executed the United Subcontract, Andrew Kocher forwarded United's financial records and the Comptroller's comments to AW's Chief Financial Officer, Tim Gerken, for review. (Ex. 97).

27.     Typically, AW does not submit subcontractor financials to the company's CFO for review. (Reichart Dep. 77:10-14).

28.     Upon review of United's financials and the Comptroller's comments, AW's CFO advised: "I wouldn't disagree with Jim's notes. *If they are truly the best way for you to manage your fee on the job, you need to make sure you take every precaution with this sub.*" (Ex. 97).

29.     James Reichart explained the CFO's direction to "take every precaution" as follows: "[United] is a small business. You have to be careful. If they spend money they don't have, who gets held liable." (Reichart Dep. 75:19 – 76:1).

30.     As advised by the Comptroller and CFO, AW required United to obtain Payment and Performance Bonds and return them to AW with the executed United Subcontract. (Moon Dep. 55:11-20).

### *3.      AW's Fraudulent Concealments and Misrepresentations*

31.     In October 2010, United's bond agent contacted ACC for its consideration in issuing Performance and Payment Bonds for the Project on behalf of United, (Ex. 2 p. ACC020832), and ACC began its underwriting analysis of United. (Silverstein Aff. ¶ 4).

32.     ACC, having been advised that United's work on the Project had commenced, requested from AW as part of its underwriting analysis information regarding United's bid and performance of the work thus far. (Ex. 4; Silverstein Aff. ¶ 6).

33.     Specifically, ACC provided a form to AW (the "All Rights Letter") (Ex. 35) and requested AW to confirm the following two facts:

> (1) [United's] price for this bonded job was in line, in that it was less than 10% lower than the next responsible bidder's price.
>
> (2) [AW is] in possession of no facts or information, at this time, which would lead us to believe that the principal would have any problem completing this job according to plans and specifications, on schedule and paying all bills for which the principal is responsible.

(Ex. 35).

34.     AW knew that ACC would be relying on the information in the All Rights Letter to issue the United Bonds, as confirmed by the deposition testimony of Randy Moon, James Reichart, and Gary Lemna:

> 4      Q      You understood that this letter had to be

> 5  returned to Allegheny Casualty Company in order for
> 6  Mr. Clarambeau to get the bond for the drywall work at
> 7  the Tampa project, correct?
> 8  A  Yes.
> 9  Q  And you understood that this letter requested
> 10  certain information that Archer Western had concerning
> 11  United Construction's bid, correct?
> 12  A  Yes.
>
> 19  **Q  And as we go down, you understood, Mr. Moon,**
> 20  **that Allegheny Casualty Company was seeking the**
> 21  **information requested in this letter so that it could**
> 22  **determine whether or not to issue a bond to United,**
> 23  **correct?**
> 24  **A  Yes**.

((Moon Dep. 73:4-12, 74:19-24; *accord*, Lemna Dep. 13:20-23 ("This was a letter that United needed in order to get a bond."); Reichart Dep. 87:23 - 88:5 ("Q: Archer Western received this All Rights Letter, Exhibit 35, and understood from that letter that the bonding company was interested in what the bid spread was, correct? A: There's a statement in there asking about that, and we responded back and didn't send them that information…").

35.  AW knew, at the time ACC requested the bid spread information, that the bid spread between United and the next lowest bidder was 25 - 30%. (Moon Dep. 40:21-22; Reichart Dep. 66:25 – 67:4).

36.  AW knew, at the time ACC requested the bid spread information, that its Comptroller Jim Panozzo had "concerns" about United's ability to perform the work. (*See* Para. 24, *supra*; Ex. 34).

37.  Notwithstanding its knowledge of these facts, AW provided ACC with the following response to ACC's request for information (Ex. 3):

> To the best of our knowledge, the work performed to date by United Construction on
> a project known as, AWDJV Project #210048, Contract #210048S13, VA Polytrauma
> [sic] Addition, Phase 3 and 3, is satisfactory in every respect and is on schedule.  To
> the best of our knowledge, we know of no unpaid laborers or material suppliers.

The subcontract amount is $1,665,000 and I would estimate that the job is 2% complete.

We are in possession of no facts or information, at this time, which would lead us to believe that the principal would have any problem completing this job according to plans and specifications, on schedule and paying all bills for which the principal is responsible.

(Ex. 3).

38.     AW intentionally withheld information about the drywall bid spread because it knew that the spread between United's bid and the next low bidder was much greater than the 10% referenced in ACC's All Rights Letter:

```
 9      Q       You did not tell Allegheny that United's bid
10      was more than 10 percent lower than the next responsible
11      bidder's price, did you?
12      A       Our response to the All Rights Letter is to be
13      as truthful as we can and items that we thought that we
14      were not going to be truthful, we did not include in the
15      All Rights letter.
```

(Moon Dep. 78).

```
13      Q       Now, you left out the paragraph of the
14      All Rights Letter that referred to the contractor's
15      price being in line and that it was less than 10 percent
16      lower than the next responsible bidder's price, correct?
17      A       Correct.
18      Q       Why did you do that?
19      A       Because it was not true.

10      Q       You didn't tell ACC that that wasn't true, did
11      you?
12      A       No, we did not.
```

(Moon Dep. 82:13-19, 83:10-12).

```
19      Q       In this letter, Archer-Western did not include
20      the phrase that was requested by Allegheny concerning
21      confirmation that the contractor's price was less than
22      10 percent lower than the next responsible bidder's
23      price, did it?
24      A       That's correct.
25      Q       Why not?
```

8

1    A  **Because their price wasn't less than**
2    **10 percent different**.

19    Q  Well, you didn't send them anything about the
20    bid spread, did you?
21    A  No.
22    Q  You didn't send them any factual information
23    that you were aware of, correct?
24    A  Why would we send them that information?
25    Q  **Well, you knew they were asking about --**

1    A  ***We didn't respond to <u>that question</u>***.
2    Q  **And you didn't respond to the question, and**
3    **you knew that in fact the United bid was approximately**
4    **30 percent lower than the next lowest bid, correct?**
5    A  ***Yes.***

((Reichart Dep. 83-85 (emphasis added); *accord* Lemna Dep. 15:9-11 (Q: Did Randy tell you

anything [with regard to the bid spread when drafting the letter]? A: He said we couldn't say that;

that that wasn't true.")).

39.    In addition to withholding the bid spread information, AW affirmatively neglected to

share Comptroller Jim Panozzo's concerns that United might be financially unable to perform the

Subcontract:

15    Q  So Archer Western ***was*** in possession of facts
16    about which Archer Western had concerns related to
17    United's financial position, correct?
18    MR. KUCHINSKI: I object to form.
19    A  We were -- we wrote this letter based on the
20    information that we had available at that time.
21    Q  The information you had available at that
22    Time, as is set forth in Exhibit 34, included concerns
23    about United's cash position and their working capital,
24    correct?
25    A  Correct.
**1    Q  And you didn't convey that information to**
**2    Allegheny in this letter, correct?**
**3    A  That information was not conveyed . . . .**

((Moon Dep. 85-86 (emphasis added); Ex. 34; Paras. 24, 36 *supra*)).

40.     ACC interpreted AW's Response to the All Rights Letter and the omission of the bid spread statement to mean that there were no issues with regard to United and the Project. ((Parrish Dep. 78:7-13 ("A: …We took that paragraph to mean that they believed there were no issues. Q: Right. But they took out the part about not being 10 percent, within 10 percent of the next -- A: Would that not be an issue?")).

41.     ACC relied on AW's response to the All Rights Letter in its underwriting analysis and its decision to issue the United Bonds. ((Parrish Dep. 107:16-17 ("But we relied on it to make an underwriting decision."); Silverstein Aff. ¶ 7)).

42.     Knowledge of a large bid spread may impact a surety's underwriting decision with regard to a Bond request. (Parrish Dep. 109:3-17).

43.     In the case of United, ACC would have not have issued the Bonds if ACC had been told the bid spread or been told that AW had concerns regarding United's ability to pay its bills. (Silverstein Aff. ¶ 9).

    *4.     United's Financial Collapse and ACC's Damages*

44.     On September 2, 2011, AW declared United in default for its inability and failure to pay its laborers and materialmen on the Project (Ex. 24) and thereafter asserted a claim against ACC under the Performance Bond. (Ex. 21).

45.     Shortly after United was held in default and AW made its claim on the Bond, AW moved $650,000 from its contingency account to its Project profit account. (Ex. 93; Reichart Dep. 33:3-13).

46.     ACC stepped in under the Performance Bond to complete the Project and ultimately suffered $2,477,719.11 in losses as a result of executing the United Bonds. (Silverstein Aff. ¶¶ 12, 18).

**B.    ACC IS ENTITLED TO VOID AND RESCIND THE BONDS AND TO RECOVER ITS LOSSES BASED UPON AW'S FRAUDULENT MISREPRESENTATIONS.**

*1.    ACC is entitled to summary judgment granting Counts I, II and III of ACC's Complaint and dismissing AW's Complaint in its entirety due to AW's Fraud by Concealment and Nondisclosure of a Material Risk.*

ACC seeks summary judgment that the United Bonds are void *ab initio* and rescinded because AW intentionally misrepresented and fraudulently concealed material information from the Surety during the underwriting process. As the Bonds therefore are unenforceable, AW's Complaint and its claims against the Bonds must be dismissed, and ACC is entitled to recover from AW the losses it incurred as a result of executing the Bonds.

An obligee has an affirmative duty to disclose facts known to it when, as here, the surety expressly seeks and requests such information from the obligee as part of the transaction. *Gutter v. Wunker*, 631 So.2d 1117, 1118-19 (Fla. 4th DCA 1994) ("[W]here a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed."); *Bill Terry's, Inc. v. Atlantic Motor Sales, Inc.*, 409 So.2d 507, 509 (Fla. 1st DCA 1982); *see also St. Paul Fire & Marine Ins. Co. v. Commod. Credit Corp.*, 646 F.2d 1064, 1072-73 (5th Cir. 1981) (explaining that creditor may be charged with withholding information where "there is a request for information by the surety"). Accordingly, Florida courts and the Fifth Circuit have held that bonds may be voided and sureties may be discharged from bond obligations where a bond obligee omits material information in response to an inquiry from a surety. For example, the Florida Supreme Court explained in *Lambert v. Heaton*:

> [I]t is the rule that if with the knowledge or assent of the creditor any material part of the transaction between the creditor and his debtor is misrepresented to the surety, the misrepresentation being such that but for the same having taken place either the suretyship would not have been entered into at all, or, being entered into, the extent of the surety's liability might thereby be increased, the surety so given is void at law, on the ground of fraud. And if facts material to the surety are concealed by the obligee when it is his duty to disclose them, his motive in concealing is immaterial.

11

134 So.2d 536, 539 (Fla. 1st DCA 1961) (citations omitted). Moreover, Section 627.409 of the Florida Statutes provides that any insurance policy may be deemed void if misrepresentations are made during "negotiations" for the policy, such that the insurer would not have issued the policy absent such misrepresentation. Thus, both Florida common law and statutory law support ACC's right to rescind its Performance Bond. *Fabric v. Provident Life & Acc. Ins. Co*., 115 F.3d 908 (11th Cir. 1997), *reh. den*. 129 F.3d 617, *cert. den*. 523 U.S. 1095 (occurrence of misrepresentations covered by statute entitles insurer to rescission of policy).

Similarly, in 1981 the Fifth Circuit[2] released two sureties from their bond obligations as a result of an obligee's failure to disclose material information. *St. Paul*, 646 F.2d at 1075. The *St. Paul* court examined whether an obligee's "failure to inform the sureties of facts not known to them that materially increased the risk assumed amounted to a discharge of the sureties." *Id.* at 1070. In discharging the sureties, the Court explained the applicable law as follows:

> In some respects, however, the suretyship bond is fragile, easily broken by the conduct of the creditor. The validity of the contract may be vitiated ab initio by the creditor's actions during its creation. A creditor who, during negotiations, actively and fraudulently conceals pertinent facts cannot then turn to the surety for reimbursement. Similarly, the surety has a defense to liability if, before the obligation is undertaken, the creditor knew of facts unknown to the surety and which he had reason to believe were not known to the surety, the facts materially increased the obligor's risk and the creditor had adequate time to disclose them but failed in his responsibility.

*Id.* at 1073 (citations omitted).

Thus, pursuant to *Lambert* and *St. Paul*, to void and rescind the United Bonds, ACC must merely establish that AW (i) knowingly or with assent (ii) misrepresented material information to ACC that (iii) would increase the surety's liability or would have caused ACC not to issue the United

---

2 Pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), decisions of the Fifth Circuit, as that court existed on September 30, 1981, are binding as precedent on the Eleventh Circuit.

Bonds if it had known such information. *See Lambert,* 134 So.2d at 539; *St. Paul,* 646 F.2d at 1073. Here, AW's fraudulent conduct satisfies all elements required under Florida law to void and rescind the United Bonds.

AW concealed from ACC the truth regarding the drywall bid spread.  ACC specifically requested that AW confirm that United's bid was "in line," meaning that it was "less than 10% lower than the next responsible bidder's price." (Ex. 35). AW, in this arm's length transaction, responded to ACC's request by concealing and withholding the fact that the spread between United's bid and the next lowest bidder was much more than twice as large (25-30%) than that considered by ACC to be "in-line." (Ex. 3). AW knew the bid spread information was material to ACC.  (Moon Dep. 73:4-12, 74:19-24; Lemna Dep. 13:20-23; Reichart Dep. 87:23-88:5). Yet, AW knowingly and intentionally withheld the extent of the bid spread from ACC. (Moon Dep. 78:9-15, 82:13-19, 83:10-12; Reichart Dep. 83:19-85:5). Instead, AW affirmatively misrepresented to ACC that it "was in possession of no facts or information" that would cause concern with regard to United's performance. (Ex. 3). Of course, United's low bid was, itself, a fact that would cause concern about United's performance. Regrettably, ACC unwittingly relied upon AW's misrepresentation and issued the United Bonds to the Surety's detriment. (Parrish Dep. 107:16-17; Silverstein Aff. ¶¶ 7-8).

Similarly, AW made a direct, material misrepresentation to ACC regarding its concerns about United's financial condition when it informed ACC that AW was "in possession of no facts or information, at this time, which would lead us to believe that the principal would have any problem completing this job according to plans and specifications, on schedule and paying all bills for which the principal is responsible." (Ex. 3). AW was best situated to evaluate United's financials with regard to its own Project demands and schedule, and such information was material to ACC.  *See St. Paul*, 646 F.2d at 1074 ("Among the facts that are material to a suretyship transaction is the financial condition of the principal."). At the time of its response to the surety, AW had reviewed United's

financial information and internally had expressed concern regarding United's financial condition. Again, Andrew Kocher had forwarded United's financials to AW's Comptroller Jim Panozzo for his opinion. (Ex. 34). Mr. Panozzo replied, "*I have a few concerns with this company*" and commented on United's financial statements, cash position, and revenue. (Ex. 34). Mr. Panozzo's proposed solution to his concerns: "Definitely" get bonds for United and thus shift the liability risk to the surety. (Ex. 34). AW knowingly induced ACC to issue the United Bonds by concealing the Contractor's concerns regarding United's financials. (Ex. 3). AW's concealment of its concerns from ACC is direct fraud independently sufficient to void the Bonds under *Lambert* and *St. Paul* (*supra*).

Admittedly, as part of its underwriting process, ACC had access to many of the same United financial reports that AW reviewed. However, the significance of such financial information was masked when AW led ACC to believe that United's bid was "in line." (Silverstein Aff. ¶ 8). A subcontractor in questionable financial health still can finish a properly bid job because sufficient cash flow exists from the Project work to pay its bills. (*Id.*). When the job is underbid, however, the subcontractor has committed itself to pay out more money in labor and material costs than it will receive in payment for its work. (*Id.*). Thus, an underbid job requires a greater financial investment from the subcontractor such that the financial health of the subcontractor takes on added significance. (*Id.*). In sum, ACC's evaluation of United's financials could not possibly have been as meaningful or predictive as AW's evaluation of United's financials because only AW had knowledge of the "out of line" drywall bid spread. *See Gallina v. Commerce & Indus. Ins.*, 2008 U.S. Dist. LEXIS 75676 at *26 (M.D. Fla. Sep. 30, 2008) (finding insurance policy void because misrepresented information about business "was a factor [insurance company] considered in using the umbrella coverage and it was information that would naturally influence the judgment of the insurer in making the contract or in estimating the degree and character of the risk).

14

Although *Lambert* holds that AW's "motive in concealing is immaterial," 134 So.2d at 539, AW's wrongdoing is highlighted by the Defendants' top-to-bottom company scheme to defraud ACC in order to increase AW's profit on the Project. At the time AW received United's bid, it stood to gain a remarkable $1 Million in savings between United's bid price and AW's original costs for drywall work included in the overall bid to the VA.   (Reichart Dep. 51:3-18). Critically, Project Manager Randy Moon, Vice President James Reichart, and other AW management members received bonuses based on the profitability of the Project. (Reichart Dep. 29:15 - 31:7). Company executives advised to protect the profit by "definitely" getting bonds and "taking every precaution". (Ex. 34, Ex. 97). Thus, in September 2011, shortly after holding United in default and demanding that ACC honor the Performance Bond, AW shifted $650,000 from Project contingency to Project profit. (Ex. 93). In this way, AW sought to reap the rewards of its misrepresentations to the Surety.

        2.       *Alternatively, ACC is entitled to summary judgment in favor of ACC on Count IV of its Complaint due to AW's Intentional and Fraudulent Misrepresentation.*

Four elements are necessary to establish fraudulent misrepresentation under Florida law: (1) a false statement concerning a material fact; (2) the representer's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation. *Specialty Marine & Indus. Supplies, Inc. v. Venus* 66 So.3d 306, 310 (Fla.1st DCA 2011) ((citing *Butler v. Yusem*, 44 So.3d at 105 (Fla. 2010); *Johnson v. Davis*, 480 So.2d 625, 627 (Fla.1985)). Moreover:

> Justifiable reliance is not a necessary element of fraudulent misrepresentation. *Butler*, 44 So.3d at 105. Because justifiable reliance is not an element of fraudulent misrepresentation, "a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had [the recipient] made an investigation, unless [the recipient] knows the representation to be false or its falsity is obvious." *Gilchrist Timber Co. v. ITT Rayonier, Inc.,* 696 So.2d 334, 336 (Fla.1997) (quoting *Besett v. Basnett,* 389 So.2d 995, 998 (Fla.1980)).

*Specialty Marine,* 66 So.3d 306, 310 (Fla.1st DCA 2011).

Here, AW intentionally and knowingly concealed material information in its response letter to ACC such that ACC was led to believe that no issues or concerns existed with regard to United's ability to complete the Project. Multiple levels of corporate authority considered, reviewed and authorized AW's response to ACC, with the corporate goal clearly espoused: "Definitely have [United] bonded" and "Take every precaution with this sub."   AW knew that ACC would be relying on its response in determining whether to issue the Bonds. (Moon Dep. 73:4-12, 74:19-24; Lemna Dep. 13:20-23; Reichart Dep. 87:23-88:5). After United defaulted, ACC stepped in to complete the Project and ultimately suffered $2,477,719.11 in damages as a consequence of relying upon Archer's dishonesty.

In short, as a result of AW's fraudulent concealment and misrepresentations, ACC is entitled to declaratory relief that its Bonds are void, rescission of its Bonds, and recovery of its losses from having executed the Bonds as a result of AW's fraudulent misrepresentation.  In addition, with the Bonds void and rescinded, ACC is entitled to summary judgment dismissing AW's Complaint against the Performance Bond. Alternatively, ACC is entitled to damages in tort against AW for its intentional misrepresentation (Count IV). The only issue remaining for trial is the amount of ACC's recoverable damages.

## II.     ISSUE II:  IN THE ALTERNATIVE, IF RESCISSION IS NOT GRANTED, ACC'S LIABILITY MUST BE LIMITED TO THE PENAL SUM OF THE BOND.

### A.     STATEMENT OF MATERIAL UNDISPUTED FACTS

1.     The penal sum of the Performance Bond was $1,665,000.00. (Ex. 37).    The Performance Bond contains the following provisions:

> [The Surety is] held and firmly bound unto [AW] in the penal sum of one million six hundred sixty-five thousand dollars and no cents, ($1,665,000.00)(the "Subcontract Price")

> The Surety agrees that no change, extension of time, alteration, addition, deletion, amendments or other modification of the terms of either the said Subcontract or the Prime Contract between Obligee and the Project Owner, or both, or in the said work

16

> to be performed, or in the specifications, or in the plans shall in anywise affect its obligations on this Bond except that the penal sum of this Bond shall increase directly with any amendments issued to the Subcontract; and it does hereby waive notice of any such changes, extensions of time, alterations, additions, deletions, amendments, and other modifications.

(Ex. 37). During United's and ACC's performance of the Subcontract work, AW issued change orders that increased the total Subcontract price, and therefore the Performance Bond penal sum, to $1,770,953.00. (Silverstein Aff. ¶ 10).

2.     On September 2, 2011, AW declared United in default for its inability and failure to pay its laborers and materialmen on the Project (Ex. 24) and thereafter asserted a claim against ACC under the Performance Bond. (Ex. 21).

3.     ACC stepped in under the Performance Bond to complete the Project and ultimately suffered $2,477,719.11 in damages as a result of executing the United Bonds. (Silverstein Aff. ¶ 12, 18).

4.     On May 15, 2012, ACC and AW entered into a Takeover Agreement wherein it was agreed that ACC would directly complete the Subcontract under a full reservation of all rights and defenses. (Ex. 6). The Takeover Agreement contained the following provisions:

> 4.     The Owner agrees that the Contract Balance is dedicated to and will be applied to the completion of the Original Contract pursuant to this Agreement and the Original Contract. The Owner shall pay directly to the Surety progress and final payments pursuant to the terms of the Original Contract. Subject to the bond penalty and other equitable and legal defenses that may exist, the Surety agrees to spend its own funds as may be necessary from time to time to pay for the performance of the Original Contract by the Completion Contractor.

> 8.     The total liability of the Surety under this Agreement and the Performance Bond for the performance of the work is limited to and shall not exceed the penal sum of One Million Six Hundred Sixty Five Thousand dollars ($1,665,000.00), as defined in the Performance Bond, provided however: (a) in accordance with paragraph 2 of the Performance Bond the penal sum of this Performance Bond shall increase directly with any amendments issued to the Original Contract and; (b) in accordance with paragraph 6(d) of the Performance Bond the Surety's liability under Paragraph 6 shall not exceed, in the aggregate, the penal sum of $1,665,000.00, subject to Paragraph 2 thereof. All payments properly made

> by the Surety for the proper performance of the Original Contract for work completed after the Declaration, shall be credited against the penal sum of the Performance Bond. Nothing in this Agreement constitutes a waiver of such penal sum or an increase in the liability of the Surety under the Performance Bond.

(Ex. 6).

5.      ACC properly performed the work of the Subcontract up to the point where ACC had expended funds that exceeded the penal sum of its Performance Bond. (Ex. 9; Ex. 11; Silverstein Aff. ¶ 13).

6.      Specifically, ACC incurred at least $2,980,023.61 in performance-related costs to complete the Project. (Silverstein Aff. ¶ 14). [3]

7.      ACC received $901,400.40 in payments from AW pursuant to the Contract. (Silverstein Aff. ¶ 15).

8.      ACC's performance costs exceeded the penal sum of the Bond by at least $307,670.21 [4] (Total performance costs minus payments received minus penal sum obligations). (Silverstein Aff. ¶ 15).

## B.      ACC'S LIABILITY IS LIMITED TO THE PENAL SUM OF THE BOND.

AW asserts claims against the Performance Bond for costs AW incurred to correct allegedly defective and incomplete drywall work after ACC left the Project. Because ACC's liability is capped at the penal sum of the bonds, and because ACC exceeded the penal sum during its performance of United's work on the Project, ACC owes no liability to AW. Thus, ACC is entitled to summary judgment dismissing AW's claims against the Performance Bond.

Under Florida law, "[t]he suretyship contract is commonly referred to as a surety bond and is subject to the general laws of contract." EDWARD ETCHEVERRY, FLORIDA CONSTRUCTION LAW AND

---

3 ACC cites to this figure pursuant to the damages calculations it last provided in its Answers to AW's Second Interrogatories. Upon completion of discovery and upon further analysis of its costs and records, ACC determined that it in fact incurred $3,108,288.63 in performance-related costs to complete the Project. *See* Silverstein Aff. ¶¶ 14-17. ACC reserves its rights to assert its updated damages at trial.

4 See Note 3, *supra*. In fact, ACC's performance costs exceed the penal sum of the Bond by $435,935.23.

PRACTICE, 8.27 (4ᵀᴴ ED. 2002) ((*citing American Home Assurance Co. v. Larkin General Hospital, Ltd.*, 593 So.2d 195 (Fla. 1992) (stating that a "bond is a contract, and, therefore, a bond is subject to the general law of contracts"); *School Board of Escambia County, Fla. v. TIG Premier Ins. Co.*, 110 F. Supp. 2d 1351 (N.D. Fla. 2000) (stating that "obligations arising out of the bond are subject to general contract law"); *A.M. Crabtree v. Aetna Casualty & Surety Co.*, 438 So.2d 102 (Fla. 1st DCA 1983) (stating that a "bond is a contract subject to the general laws of contract")).

One of the most fundamental principles of suretyship law as determined by the Florida Supreme Court is that a surety's liability cannot be extended by implication and is strictly limited to the terms and conditions of the bond. *See American Home Assurance Co. v. Larkin General Hospital, Ltd.*, 593 So. 2d 195 (Fla. 1992). As clearly stated in *Larkin*, "***the surety's liability for damages is limited by the terms of the bond***." *Id. at* 198, *citing Cone v. Benjamin*, 8 So.2d 476 (1942) and *Fidelity & Deposit Co. v. Sholtz*, 168 So. 25 (1935) (emphasis added). As such, "***Florida courts have long recognized that the liability of a surety should not be extended by implication beyond the terms of the contract, i.e., the performance bond***." *Id.*, *citing State v. Wesley ConsDep. Co.*, 316 F.Supp. 490, 497 (S.D.Fla.1970), *affirmed,* 453 F.2d 1366 (5th Cir. 1972); *Standard Accident Ins. Co. v. Bear,* 134 Fla. 523, 184 So. 97 (1938); *Gato v. Warrington*, 37 Fla. 542, 19 So. 883 (1896); *see also Crabtree,* 438 So.2d at 105 ("[a] surety on a bond does not undertake to do more than that expressed in the bond, and has the right to stand upon the strict terms of the obligation as to his liability thereon").

An equally well-established principle of suretyship is that the liability of a surety is limited to the amount, or penal sum, stated in the bond:

> The general rule recognized by the almost unanimous weight of authority in this country is that ***recovery on a penal bond is limited to the amount of the penalty named in the bond***, with interest from the date of breach. This general rule prevails even though the bond is for the protection of more than one person or is subject to renewal from term to term. . . .

19

*Travelers Indem. Co. v. Askew*, 280 So.2d 469, 471 (1ˢᵗ DCA 1973) (emphasis added); s*ee also St. Paul Mercury Ins. Co. v. Dep't of State, Div. of Corrections*, 581 So.2d 976 (Fla. 1ˢᵗ DCA 1991) (limiting damages to bond penal sum, "even if the actual damages exceed that amount").

Federal courts applying Florida law recognize the penal sum limit. *Westchester Fire Ins. Co. v. City of Brooksville*, 731 F.Supp.2d 1298, 1308 (M.D.Fla. 2010) ("If the principal defaults on an indemnity bond, the face value of the bond establishes the obligee's maximum recovery, and the obligee may recover only the actual damage incurred."). Moreover, the Fifth Circuit interpreted a construction performance bond in 1953 and upheld the well-established legal principle that the purpose of fixing a penal sum in a bond is to limit the liability of the surety:

> If appellant's contention that the surety's liability may exceed the sum stated on the face of the bond is correct, and it is not, it would be futile to state any amount of liability in the bond. This contention completely overlooks the well-established rule in Texas and elsewhere that ***the sole object of stating the penalty in a bond is to fix the limit of the liability of the signers, and no recovery can be had on such bond against the principal or surety beyond the penalty named on the bond***.
>
> * * *
>
> If, therefore, surety breached a condition of the bond it was liable in damages for the breach but it was no more liable than it would be for the original breach by Elliott and ***under no circumstances could it be held in an amount greater than the penal sum of the bond***.

*Bill Curphy Co. v. Elliott*, 207 F.2d 103, 106 (5th Cir. 1953), *citing  Ferguson v. Ferguson*, 69 S.W.2d 592 (Tex. Civ. App. 1934) ("The sole object of naming the penalty in a bond is to fix the limit of the liability of the signers, and no recovery can be had on such bond against the principal or sureties beyond the penalty named"); *Mass. Bonding & Ins. Co. v. United States*, 97 F.2d 879, 881 (9th Cir. 1938); *Witter v. Mass. Bonding & Ins. Co.*, 247 N.W. 831 (Iowa 1933); *Brown v. Nat'l Surety Corp. of N.Y.*, 36 S.E.2d 588 (S.C. 1946) (the general rule is well settled that the liability of surety is limited to the amount, or the penal sum, stated in the bond); *Guffanti v. National Surety Co.*,

90 N.E. 174 (N.Y. 1909) (construing the liability of a surety on a bond under New York law to be limited to the bond's penal sum).

Similarly, a surety who elects to complete work upon its principal's default may preserve the protection of its penal sum *for its own work* by agreement with the bond's obligee. *See International Fidelity Ins. Co. v. County of Rockland*, 98 F.Supp.2d 400, 429 (S.D.N.Y. 2000) ("To avoid liability in excess of the bond amount...the surety must include a clause in the takeover agreement which limits the surety's liability in the course of performance to the original bond penalty.... The takeover agreement should also provide that all sums spent pursuant to it by the surety are to be deducted from the penal sum...."). Here, not only does the Performance Bond expressly limit ACC's liability to the penal sum, but the Takeover Agreement executed jointly by ACC and AW also limits ACC's liability to the penal sum.

## C.    BECAUSE ACC'S PERFORMANCE COSTS MET AND EXCEEDED THE PENAL SUM, ACC IS ENTITLED TO SUMMARY JUDGMENT AGAINST AW'S CLAIMS ON THE BONDS.

ACC expended at least $307,670.21 in excess of the Bond's penal sum while performing United's work. (Silverstein Aff. ¶ 15). As a result, AW is not entitled to recover any further damages of any kind against ACC as a matter of law. *Aetna Cas. and Sur. Co. v. Butte-Meade Sanitary Water Dist.*, 500 F.Supp. 193 (D.C.S.D. 1980)(surety could not be liable to obligee for liquidated damages in excess of the penal sum, even when the surety caused delay which was responsible for a portion of the obligee's liquidated damages).

ACC's Performance Bond explicitly addresses ACC's liability and preserves the penal limit of the bond. (Ex. 37). In addition, the Performance Bond also states, with specificity, the types of claims and damages that can be made in order to reach that penal sum, even when ACC elects to step in and complete the Subcontract:

21

4.      Whenever Obligee has declared Subcontractor to be IN DEFAULT OF THE SUBCONTRACT, the Surety shall, within fifteen (15) calendar days of its receipt of notice from Obligee that Subcontractor is in default, respond as follows:

a.      Complete the Subcontract Work in accordance with the subcontract terms and Conditions; . . . .

\*         \*         \*         \*         \*

6.      **The Surety shall be liable for**:

a.      The responsibilities of the Subcontractor for correction of defective work and completion of the Subcontract Work.

b.      The responsibilities of the Subcontractor for additional legal and design professional costs resulting or arising from the Subcontractor's default, or resulting or arising from the actions or failure to act of the Surety under Paragraph 4 herein.

c,      The responsibilities of the Subcontractor for damages caused by the performance or non performance of the Subcontractor.

d.      **The Surety's liability under this Paragraph 6 shall not exceed, in the aggregate, the penal sum set forth on the cover page of this Bond,** subject to Paragraph 2.

(Ex. 37). Notably, all of AW's alleged damages are contained within the penal limit of the Bond and must be barred as a matter of law.

First, AW asserts a claim against the Performance Bond for its costs incurred correcting alleged defective drywall work after ACC left the Project. (Ex. 107 p. 11, 22; Pl. Ex. D. ¶10-11). However, pursuant to Paragraphs 6(a) and 6(c) of the Bond (*supra*), costs for the correction of defective work and damages for non-performance are confined by the penal limits of the Bond. Second, AW asserts certain delay damages against ACC (Pl. Ex. D. ¶10-11), which are also confined to the penal sum under Paragraphs 6(a), 6(b) and 6(c) (*supra*) as well.  Third, AW asserts damages for the costs it incurred in completing allegedly incomplete subcontract work after ACC left the Project. (Ex. 107 p. 11, 22; Pl. Ex. D. ¶10-11). Responsibility for "completion of the Subcontract Work" is within the Bond penal sum under Paragraph 4(a), and ACC indisputably has incurred

22

completion expenses beyond the penal sum in performing the work.  *See, Travelers Indem. Co. v. Askew*, 280 So.2d at 471.  As stated in *Bill Curphy Co.*, any argument to the contrary would make it "futile to state any amount of liability in the bond" and would be contrary to ACC's clear and unambiguous intent to limit its potential liability to the stated penal sum of the Performance Bond. 207 F.2d at 106.

Notwithstanding the express penal sum limit of the Performance Bond, the Takeover Agreement also conclusively preserves ACC's limited liability:

> 8.     ***The <u>total liability</u> of the Surety under this Agreement and the Performance Bond for the performance of the work is limited to and shall not exceed the penal sum*** of One Million Six Hundred Sixty Five Thousand dollars ($1,665,000.00), as defined in the Performance Bond, provided however: (a) in accordance with paragraph 2 of the Performance Bond the penal sum of this Performance Bond shall increase directly with any amendments issued to the Original Contract and; (b) ***in accordance with paragraph 6(d) of the Performance Bond the Surety's liability under Paragraph 6 shall not exceed, in the aggregate, the penal sum of $1,665,000.00, subject to Paragraph 2 thereof***. All payments properly made by the Surety for the proper performance of the Original Contract for work completed after the Declaration, shall be credited against the penal sum of the Performance Bond. ***Nothing in this Agreement constitutes a waiver of such penal sum or an increase in the liability of the Surety under the Performance Bond.***

(Ex. 6). Thus, pursuant to the Takeover Agreement, AW expressly agreed that ACC's total liability with regard to completion of the work would be the Performance Bond's penal sum.  Indeed, by adopting Paragraph 6 of the Bond as part of the Takeover Agreement, AW agreed that the limit of liability applied to all costs associated with completion of the work *and* all damages "caused by performance or non-performance" on the part of ACC.

Here, ACC has incurred liability in excess of the Bond penal sum. (Silverstein Aff. ¶ 15). Pursuant to the express terms of the Performance Bond and the Takeover Agreement, the penal sum limit applies collectively to the *combined* costs of completion of the subcontract work, completion of alleged defective work, completion of alleged incomplete work, and delay damages. For *all* of these

23

costs together, ACC's liability is limited to its penal sum.  Because ACC already has incurred performance costs in excess of its penal sum, AW simply cannot recover any more money from the surety.  Thus, ACC is entitled to summary judgment as a matter of law against AW's Complaint for damages against the Performance Bond.

**WHEREFORE**, ACC prays for the entry of summary judgment as follows:

1.      Summary judgment GRANTING Count I of ACC's Complaint and declaring the United Bonds void as a result of AW's fraudulent misrepresentation; and

2.      Partial summary judgment GRANTING Count II of ACC's Complaint and rescinding the United Bonds as a result of AW's fraudulent misrepresentation; and

3.      Partial summary judgment GRANTING ACC's entitlement under Count III of ACC's Complaint to recover from AW the costs ACC incurred and the benefits AW gained from inducing ACC to issue the Bonds, now void and rescinded; and

4.      Summary judgment DISMISSING AW's Complaint against the Performance Bond in its entirety because the United Bonds are void and rescinded as a result of AW's fraud. Accordingly, the only issue remaining for trial is the amount of damages that should be awarded to ACC pursuant to Counts I – III of ACC's Complaint.

5.      Or, alternatively, partial summary judgment GRANTING Count IV of ACC's Complaint for Intentional Misrepresentation. The only issue remaining for trial is the amount of damages that should be awarded to ACC under Count IV; or

6.      Or, alternatively, summary judgment DISMISSING AW's Complaint against the Performance Bond in its entirety because ACC's liability is capped at the penal sum of the Bond, which ACC already has expended.

**Dated: June 1, 2014**

Respectfully submitted,

_____/s/ Carter B. Reid_____
Carter B. Reid (*pro hac*)
Sarah K. Simmons (*pro hac*)          Guy W. Harrison, Esq.
WATT, TIEDER, HOFFAR                  ETCHEVERRY HARRISON LLP
& FITZGERALD LLP                      150 S. Pine Island Road, Suite 105
8405 Greensboro Drive, Suite 100      Fort Lauderdale, FL 33324
Mclean, VA 22102                      954.370.1681 (phone)
703.749.1000                          954.370.1682 (fax)
creid@wthf.com                        harrison@etchlaw.com

*Attorneys for Plaintiff Allegheny Casualty Company*

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2014, I served the foregoing via ECF to the following:

Edward J. Kuchinski
Neal Sivyer
SIVYER BARLOW & WATSON, P.A.
401 E. Jackson Street, Suite 2225
Tampa, FL 33602
813.221.4242 (phone)
813.227.8598 (fax)
ekuchinski@sbwlegal.com

*Attorney for Defendants*

_____/s/ Sarah K. Simmons_____
        Attorney