UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALLEGHENY CASUALTY CO.,

        Plaintiff,                           Case No. 8:13-cv-128-SCB-TGW

v.

ARCHER-WESTERN/DEMARIA
JOINT VENTURE III, *et al*,

        Defendants.
_____/

## ORDER

    This matter comes before the Court on: (1) Defendants Archer-Western/Demaria Joint Venture III, Archer Western Contractors, LLC, Demaria Building Company (collectively "Archer"), Liberty Mutual Insurance Company ("Liberty Mutual"), and Travelers Casualty and Surety Company of America's ("Travelers") Motion for Partial Summary Judgment, to which Plaintiff Allegheny Casualty Company ("ACC") has filed a response in opposition (Dkt. 79; Dkt. 98); and (2) ACC's Motion for Summary Judgment, to which Archer has filed a response in opposition (Dkt. 82; Dkt. 97). The Court directed the parties to file supplementary memoranda regarding some of the issues raised in their cross-motions for summary judgment; the parties filed timely responses. (Dkts. 102,105, 109).

## I.    STANDARD OF REVIEW

    Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This burden rests on the moving party, and in reviewing a summary judgment motion, the

Court is required to draw all reasonable factual inferences in favor of the non-moving party. *Cline v. Tolliver*, 434 F. App'x 823, 824 (11th Cir. 2011); *Marshall v. City of Cape Coral, Fla.*, 797 F.2d 1555, 1559 (11th Cir. 1986). Once the moving party satisfies its burden, the non-moving party may avoid summary judgment by establishing that a genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). A genuine issue of material fact "does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000). Thus, the "mere existence of a scintilla of evidence . . . will be insufficient" to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In reviewing a motion for summary judgment, the Court "need consider only the cited materials, but . . . may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.      BACKGROUND

This case arises out of a construction project by the United States Department of Veteran's Affairs ("VA"), the Tampa Polytrauma Project. (The "Project"). Archer was the general contractor for the Project, and Archer retained non-party United Construction Company of Central Florida ("United") to serve as its drywall subcontractor. At Archer's request, United obtained two surety bonds from ACC, including a performance bond that secured performance of the drywall work in the event of United's default.

A. Archer as General Contractor & Selection of United as Subcontractor

On March 19, 2010, Archer submitted a bid proposal to the Department of Veteran Affairs ("VA") to serve as general contractor for a $52,000,000 expansion to the James A. Haley Veterans' Hospital in Tampa, Florida. (Dkt. 79-14 at 6; Dkt. 82-2 at 37-41). The Project involved a significant amount of drywall work, and in preparing its proposal to submit to the

VA, Archer received estimates from drywall subcontractors ranging from $2,625,684 to $4,600,000. (Dkt. 82-2 at 26; Dkt. 85-5 at 51:21-52:7).[1] Archer used the lowest drywall bid, $2,625,684, in its proposal to the VA. (Dkt. 97-6 ¶ 4).

In April 2010, the VA awarded the prime construction contract for the Project to Archer for $52,175,000.  (Dkt. 82-3 at 25-26). Pursuant to the terms of its prime contract with the VA, Archer obtained payment and performance bonds from Travelers and Liberty Mutual in the same amount. (Dkt. 8-9; Dkt. 82-3 at 25).

 Archer initiated a buy out process for the drywall work, which refers to the solicitation, negotiation, and execution of a subcontract. (Dkt. 97-6 ¶ 3). During the buy out process, Archer reviewed bids from at least three drywall subcontractors, including one from United for $1,665,000.  (Dkt. 82-2 at 25; Dkt. 85-5 at 48:19-50:4).[2] The other two bids reviewed by Archer were for $2,280,400 and $2,385,000; accordingly, United's bid of $1,665,000 was approximately 25-30 percent lower than the next lowest bid. *Id*. An Archer officer explains that the disparity between United's bid and the next lowest bid was not unusual in light of the aggressive condition of the marketplace. (Dkt. 85-3 at 67:8-15).

In addition to being 25-30 percent below the next lowest bid received by Archer, United's bid of $1,665,000 was approximately $1 million lower than the $2,625,000 bid Archer had used in preparing its bid proposal for the VA. (Dkt. 82-2 at 25; Dkt. 97-6 ¶ 4). Archer explains that during the buy out process, approximately $350,000 of work previously included in the scope of the drywall estimate was reallocated to other subcontracts. (Dkt. 97-6 ¶ 5). Due to

---

[1]United did not submit a bid for use in Archer's proposal to the VA. (Dkt. 97-6 ¶ 6)

[2]United initially submitted a bid of $1.366 million. (Dkt. 97-6 at 6). In reviewing United's bid, Archer noticed that United had failed to account for some components of the work, which led United to submit a refined bid of $1.665 million. (Dkt. 85-5 at 69:1-13; Dkt. 97-6 ¶ 6).

this reallocation, Archer explains that it recalculated its original $2,625,000 drywall estimate to

come up with a revised estimate of $2,270,000 for the drywall work. *Id.* at ¶ 8. Thus, Archer

asserts that United's bid was in actuality only approximately $613,000 lower than the revised

estimate for the drywall work. *Id*. at ¶ 9.

      An Archer officer explains that when the buy out amount is less than the estimate, the

difference is shifted to a contingency fund and ultimately becomes profit for Archer if the

continency funds are not needed. (Dkt. 85-3 at 31:23-32:10). Additionally, the same officer

explained that some Archer employees received bonuses tied to the profitability of the project.

*Id.* at 29:15-31:7.

      During the buy out process, Archer received United's December 2009 financial statement

and contacted references supplied by United. (Dkt. 79 at 6; Dkt. 79-2 at 19; Dkt. 85-5 at 39:8-

12). On July 27, 2010, Jim Panozzo, Archer's comptroller, sent an email to another Archer

officer stating:

> I have a few concerns with [United]. First, their statements are not
> audited they are simply reviewed, so the information may or may not
> be 100% accurate. Their cash position ($25k) is very weak as is their
> working capital at $166k. Our contract value would be over 10X
> larger than their working capital. Their total revenue in 2009 was
> $2.3M, so our contract would be a big one for them. If you do write
> a contract I would definitely have it bonded.

(Dkt. 82-2 at 27). Archer explains that Panozzo's recommendation to have a potential United

subcontract bonded is in accord with its corporate policy to require subcontractors to obtain

surety bonds on projects over $250,000 absent special circumstances. (Dkt. 85-3 at 66:3-16; Dkt.

85-5 at 56:3-10, 66:8-13).

      On August 13, 2010, Archer notified United by email that it had been awarded the

drywall subcontract; however, the parties did not formally execute the subcontract until

December 2010. (Dkt. 82-2 at 42; Dkt. 85-3 at 81:2-9; Dkt. 85-5 at 55:14-16; Dkt. 98-5). Archer explains that it is Archer's  policy is to have subcontractors obtain surety bonds before execution of a subcontract. (Dkt. 85-3 at 80:1-7; Dkt. 85-5 at 119:13-24).

On November 16, 2010, after Archer notified United that it had been awarded the subcontract but before the subcontract was formally executed, an Archer officer sent United's financial information to Archer's CFO along with Panozzo's comments excerpted above. (Dkt. 82-2 at 41). It was not standard procedure for Archer's CFO to review a subcontractor's financial information. (Dkt. 85-3 at 77:10-14). Archer's CFO responded, "I wouldn't disagree with Jim [Panozzo]'s notes. If they are truly the best way for you to manage you[r] fee on the job, you need to make sure you take every precaution with this sub." *Id.*

B. United Obtains Performance Bond From ACC

United retained a bond agent to obtain its surety bonds, and in October 2010, United's bond agent contacted ACC. (Dkt. 82-2 at 2; Dkt. 82-4 ¶ 4; Dkt. 98-2 ¶ 3). ACC is a wholly owned subsidiary of nationwide company that is one of the country's largest providers of construction surety bonds. (Dkt. 79-1 at 2; Dkt. 87-2 at 21:2-6). According to its website, ACC "provides bonds to contractors who would not otherwise qualify for standard surety credit." (Dkt. 79-1 at 17). The construction surety market is divided into standard and non-standard bond markets. (Dkt. 87-2 at 40:21-23; Dkt. 98-3 ¶ 5). Standard bonds are awarded to clients with good to excellent credit and previous experience. (Dkt. 98-3 ¶ 5). Non-standard bonds are used with clients who do not qualify for standard bonds, and a surety uses tools such as collateral and escrow accounts in underwriting non-standard bonds. *Id.* ACC was engaged in the non-standard surety bond market. (Dkt. 87-2 at 40:21-41:2).

After being contacted by United's bond agent, ACC initiated an underwriting process in which it determined whether to issue the surety bonds to United. (Dkt. 82-4 ¶ 4). ACC's underwriting process encompassed a review of information obtained from both Archer and United.

### 1. The All Rights Letter

Before United obtained surety bonds or formally executed a subcontract with Archer, United had performed a small portion of drywall work on the Project. (Dkt. 85-5 at 69:17-20). Archer explains that this was unusual, but it was necessary in order to comply with the construction schedule established by the VA. *Id*. at 69:21-70:1. In situations where a subcontractor has already begun performance, ACC requires a document, called the All Rights Letter, be sent to the general contractor requesting information about the subcontractor's performance to date and prospective ability to perform. (Dkt. 87-2 at 76:16-20; Dkt. 98-3 ¶ 6). On October 8, 2010, United's bond agent sent United an email saying that ACC "ha[d] a few questions/items" and that "[t]he All Rights Letter needs to completed by the Owner/GC[.]" (Dkt. 82-2 at 4). The sample All Rights Letter supplied to United was a form letter to be completed by the general contractor (Archer) on its own letterhead. The form All Rights Letter is reproduced in full below:

**ALL RIGHTS LETTER**

* SAMPLE: TO BE TYPED ON OBLIGEE'S LETTERHEAD (OR GENERAL CONTRACTOR'S LETTERHEAD IF
  OUR PRINCIPAL IS A SUBCONTRACTOR)

Date: _____

Allegheny Casualty Company
3689 Coolidge Court Unit 6
Tallahassee, Florida 32311

Dear Sir/Madam:

The work performed to date by (insert contractor's name) on a project known as (job number, contract
number and description of project) is satisfactory in every respect and is on schedule.  We know of no
unpaid laborers or material suppliers (except the following, if applicable).

The contract amount is $_____ and I would estimate that the job is _____%
complete.

*IF JOB WAS BID, INCLUDE THIS PARAGRAPH:*
This contractor's price for this bonded job was in line, in that it was less than 10% lower than the next
responsible bidder's price.

*IF JOB WAS NEGOTIATED INCLUDE THIS PARAGRAPH:*
This contractor's price for this bonded job is well in line with our estimate of what should be a fair price for
the work, including a reasonable profit.

We are in possession of no facts or information, at this time, which would lead us to believe that the
principal would have any problem completing this job according to plans and specifications, on schedule
and paying all bills for which the principal is responsible.

The remaining time allowed this contractor for completion of this project is _____ working
days and the maximum amount of liquidated damages which could conceivably be assessed against this
principal under the terms of this contract would in no event exceed $_____ per working day.

All payments due to (contractor's name) have been made, to date.

* THIS LETTER FROM THE OWNER/OBLIGEE SHOULD ALSO INCLUDE, IN THIS AREA, COMMENTS AS TO
WHY THE BOND WAS NOT PREVIOUSLY SECURED AND IS NOW BEING REQUIRED.

By: _____
     Signature

     _____
     Name (typed)                                                    Title

(Dkt. 82-2 at 7).

United forwarded the form letter to Archer and asked Archer to complete the All Rights

Letter. (Dkt. 85-5 at 72:18-24).  Archer responded by sending a letter to ACC dated October 14,

2010, which is reproduced in full below:



**A JOINT VENTURE**

Thursday, October 14, 2010

Alleghany Casualty Company
3689 Coolidge Court Unit 6
Tallahassee, FL 32311

Dear Sir/Madam,

To the best of our knowledge, the work performed to date by United Construction on a project known as, AWDJV Project # 210048, Contract #210048S13, VA Polyrauma Addition Phase 2 and 3, is satisfactory in every respect and is on schedule. To the best of our knowledge, we know of no unpaid laborers or material suppliers.

The subcontract amount is $1,665,000 and I would estimate that the job is 2% complete.

We are in possession of no facts or information, at this time, which would lead us to believe that United Construction would have any problem completing this job according to plans and specifications, on schedule and paying for all bills for which United Construction is responsible.

The remaining time allowed for United Construction for completion of this project is 300 working days and the maximum amount of liquidated damages which could conceivably be assessed against this subcontractor under the terms of this contract would in no event exceed $1,500.00 per working day.

All payments due to United Construction have been made, to date.

The bond was not previously secured because of delinquent signing of the contract.

If you have any further questions or comments, please call me at (312) 296-1371.

Respectfully,
Archer Western/ DeMaria JV III

Randy Moon
Project Manager

CC:     United Construction Contract File

(Dkt. 82-2 at 3).

ACC's claims in this lawsuit are largely premised on the statements and omissions in Archer's October 14, 2010 response letter. The form All Rights Letter given to Archer stated "***IF JOB WAS BID, INCLUDE THIS PARAGRAPH***: This contractor's price for this bonded job was in line, in that it was less than 10 percent lower than the next responsible bidder's price." (Dkt. 78-4) (emphasis original). Archer did not include the paragraph in its October 14, 2010 response letter. Randy Moon, Archer's project manager who signed Archer's response letter, acknowledges that: (1) Archer understood the form All Rights Letter as asking Archer to verify

that United's bid was less than 10 percent lower than the next responsible bidder's bid, (2) Archer knew that United's bid did not meet this criteria, and (3) Archer employees internally discussed whether to include the bid spread information in the response. (Dkt. 85-5 at 77:22-78:5, 83:1-12, 91:7-10, 99:13-100:2). Archer decided not to include the requested paragraph nor otherwise indicate whether United's bid was more than 10 percent lower than the next lowest bid. (Dkt. 82-3). Archer asserts that it decided to omit the requested paragraph because to include it would have been inaccurate. (Dkt. 79 at 5; Dkt. 85-5 at 82:13-19). Aside from omitting this paragraph and a few immaterial exceptions, Archer's response retained the form of ACC's All Rights Letter. (Dkt. 79-4; Dkt. 82-3 at 3).

Archer's October 14, 2010 response also affirmatively indicated that Archer was "in possession of no facts or information, at this time, which would lead us to believe that United . . . would have any problem completing this job according to plans and specifications, on schedule and paying for all bills for which United . . . is responsible." (Dkt. 82-3). Moon acknowledges that at the time of its letter of response to ACC, Archer knew of United's low working capital, the disparity between United's bid and the next lowest bid, and United's weak cash position. (Dkt. 85-5 at 92:1-24). Additionally, as noted above, Archer's comptroller had expressed a "few concerns" with United. (Dkt. 82-2 at 27). However, Archer maintains that it did not have evidence that United would have any difficulty in paying its bills or managing its cash flow. (Dkt. 85-5 at 153:4-9).

Gary Parrish, ACC's regional manager primarily responsible for underwriting the performance bond, read the letter and "noticed that they used their own wording format but included [the] paragraph . . . [saying] that they're in possession of no facts or information." (Dkt.

87-2 at 77:10-13; Dkt. 98-2 ¶ 1). Matthew Silverstein, ACC's claims counsel, explains that "[h]e

(Parrish) and I did discuss that there was a paragraph that apparently was removed by Archer."

(Dkt. 84-1 at 24:15-16). Despite noticing the missing paragraph, ACC never followed up with

Archer regarding the omission of the requested paragraph. (Dkt. 87-2 at 77:20-24, 79:8-11).

Silverstein explains that ACC understood Archer's statement that Archer was in possession of no

information leading it to believe that United would be unable perform the subcontract as

subsuming the information sought in the omitted paragraph. (Dkt. 84-1 at 26:1-21). Thus, Parrish

and Jeremy Zareski, Parrish's superior at ACC who granted approval to issue the bond,

interpreted Archer's response as representing that United's bid was "in-line." (Dkt. 98-2 ¶ 9;

Dkt. 98-3 ¶ 11). Aside from requesting Archer to complete the All Rights Letter, ACC did not

take any other steps to evaluate the reasonableness of United's bid. (Dkt. 84-1 at 29:11-30:24).

### 2. Other Components of ACC's Underwriting Investigation

ACC's underwriting process was not limited to reviewing Archer's response to the

requested All Rights Letter. In addition to United's December 2009 financial statement, which

Archer had obtained during its buy out process for the drywall subcontract, ACC also obtained

United's updated financial statement from June 2010. (Dkt. 79-2 at 6, 19). The December 2009

financial statement provided that United had approximately $25,000 in cash and had

approximately $570,000 in gross earnings in the 2009 calendar year. *Id* at 22-23. The June 2010

financial statement provided that United had approximately $183,000 in cash and had gross

earnings of approximately $191,000 in the first half of the 2010 calendar year. *Id*. at 9-10.

ACC also obtained the personal financial statement and credit report of Barry

Clarambeau, who was United's principal. (Dkt. 79-3; Dkt. 84-1 at 13:20-14:6). ACC reviews a

principal's personal financial information "to see if [it] add[s] or detract[s] from the picture" and acknowledges that a principal's credit score is one factor in the decision whether to issue bonds. (Dkt. 84-1 at 35:24-36:1; Dkt. 87-2 at 67:19-25). The credit report reflected  that Clarambeau had a "low"credit score and had several accounts that were "seriously past due." (Dkt. 79-3; Dkt. 87-2 at 53:20, 59:8).

ACC also sent letters to references provided by United. ACC received at least four responses, all of which positively recommended United. (Dkt. 79-2 at 37, 49-52). Sampling the four responses, the references stated that "United . . . did a great job!," "We highly recommend United . . . for their ability to perform in a professional and timely manner," "Great contractor!," and that United maintained "a great working relationship." *Id.*

### 3. ACC Decides to Issue the Performance Bond and Terms of the Bond

On October 25, 2010, Parrish sent an email to Zareski requesting approval to issue the surety bonds to United. (Dkt. 79-2 at 33-34; Dkt. 98-3 ¶ 3). Although Archer's response to the All Rights Letter is dated October 14, 2010, Parrish's email indicated that ACC was "still awaiting . . . the . . . All Rights Letter." (Dkt. 79-2 at 33). Parrish's email also stated "[o]ur job would comprise the bulk of their [United's] work on hand" and that "[t]he only real issue is the personal credit scores." *Id*. The email concluded by stating "we are asking authorization to approve this one." *Id*. at 34.

Zareski replied by email later the same day. *Id*. at 33. Although Parrish's email sent only hours earlier had indicated that ACC had not yet received Archer's response to the requested All Rights Letter, Zareski's email discusses Archer's response. (Dkt. 87-2 at 82:11-14). Zareski's email also asks about United's owner in stating that "although you touched on it in your e-mail, what happened that caused the personal credit to go so far down hill and when did this occur?"

(Dkt. 79-2 at 33). Finally, Zareski inquired about the former association between United's owner and another company. *Id.* Parrish relayed Zareski's concerns to the bond agent, but it is unclear whether Zareski's concerns were subsequently addressed. *Id.* at 35.

On November 1, 2010, ACC issued payment and performance bonds to United naming United as principal, ACC as surety, and Archer as obligee; only the performance bond is at issue in this litigation. (Dkt. 1 at 17-21).[3] Zareski, who approved issuing the bonds, explains that ACC relied on Archer's response to the All Rights Letter and that ACC would not have issued the performance bond if it had known that United's bid was 25-30% lower than the next lowest bid. *Id.* at ¶¶ 4, 8, 10. Zareski explains:

> The fact that a subcontractor's bid is not "in line" with the next lowest bidder can indicate to the Surety that the subcontractor underbid the job. Thus, such information can impact a surety's underwriting analysis of the subcontractor's financial condition. For example, a subcontractor in questionable financial health still can finish a properly bid job because sufficient cash flow exists from the Project work to pay its bills. When the job is underbid, however, the subcontractor has committed itself to pay out more money in labor and material costs than it will receive in payment for its work. Thus, an underbid job requires a greater financial investment from the subcontractor such that the financial health of the subcontractor takes on added significance.

*Id.* at ¶ 9. Parrish and Silverstein echo Zareski's statements regarding ACC's reliance. (Dkt. 82-4 ¶¶ 7, 9; Dkt. 98-2 ¶ 8).

The performance bond includes a penal sum of $1,665,000, the same amount as United's subcontract with Archer; however, the bond provides that "the penal sum . . . shall increase directly with any amendments issued to the Subcontract." (Dkt. 1 at 17). The parties agree that

---

[3]On February 27, 2014, Archer sought to add a counterclaim against the payment bond, but the Court denied leave to amend. (Dkts. 52, 93). The claims in this litigation relate solely to the performance bond.

change orders to the subcontract increased the penal sum to approximately $1,770,000. (Dkt. 79 at 3; Dkt. 82-4 ¶ 10). The performance bond provides that ACC's "liability shall not exceed, in the aggregate, the penal sum." (Dkt. 1 at 19).

The performance bond provides that upon Archer's declaration of United's default, ACC could: (1) directly complete the subcontract, or (2) arrange for Archer to enter into an agreement with a new subcontractor and pay the difference in price, or (3) tender the penal sum to Archer. *Id.* at 18. ACC's liability included "correction of defective work and completion of the Subcontract Work" and "[t]he responsibilities of the Subcontractor for damages caused by the performance or non-performance of the Subcontractor." *Id.*

C. United's Breach and the Takeover Agreement

On September 2, 2011, Archer declared United in default for failing to pay its laborers and materialmen, and failing to provide adequate assurances that it had the ability to perform its remaining obligations under the subcontract. (Dkt. 82-2 at 23; Dkt. 82-4 ¶ 11).[4] At this point, United had performed approximately 30 percent of the work called for in the subcontract. (Dkt. 82-5 at 169:20-24, 189:17-21). On September 13, 2011, Archer sent a letter to ACC with the subject line "Claim by Archer . . . on Performance Bond" stating that Archer had declared United in default pursuant to the performance bond. (Dkt. 82-2 at 20).

On May 15, 2012, Archer and ACC entered into the Takeover Agreement, which provided that ACC would directly complete United's remaining obligations under the subcontract. (Dkt. 40-1 ¶ 11; Dkt. 40-6). Specifically, the Takeover Agreement provides that

---

[4]The subcontract permitted Archer to demand that United provide adequate assurances of its ability to perform the subcontract and Archer could treat United's failure to provide such assurances as an anticipatory repudiation. (Dkt. 98-5 at 8).

"[ACC] hereby undertakes to cause the performance of each and every one of the terms, covenants, and conditions of the Original Contract, including all modifications thereto." (Dkt. 40-6 at 2). Additionally, the Takeover Agreement provides that "[t]he total liability of [ACC] under this Agreement and the Performance Bond for the performance of the work is limited to and shall not exceed the penal sum . . . as defined in the Performance Bond" and that "[n]othing in this Agreement constitutes a waiver of such penal sum or an increase in the liability of the Surety under the Performance Bond." *Id*. at 4. With respect to the penal sum, the Takeover Agreement states that "[a]ll payments properly made by the Surety for the proper performance of the Original Contract for work completed after the Declaration, shall be credited against the penal sum of the Performance Bond." (Dkt. 40-6 at 4). The Takeover Agreement defines "Declaration" as September 2, 2011, the date on which Archer declared United in default. (Dkt. 40-6 at 2; Dkt. 82-2 at 23).

D. ACC's Performance

ACC retained  Fasano Acchione & Associates ("Fasano") to manage the project. (Dkt. 79-14 at 10; Dkt. 79-15 at 6; Dkt. 84-1 at 31:27, 114:3-4). IWES Contractors ("IWES"), who United had previously used to supplement its own workforce prior to default, was retained  to perform the remaining obligations of the subcontract. (Dkt. 79-14 at 8, 10; Dkt. 79-15 at 6; Dkt. 84-1 at 113:17-19, 152:19-20). Through the services of Fasano and IWES, ACC began performance prior to the May 15, 2012 execution of the Takeover Agreement and this

performance continued until the point where ACC asserts that it exhausted the penal sum. (Dkt. 79-14 at 16; Dkt. 79-12 at 2; Dkt. 84-2 at 25:7-18).[5]

On November 7, 2012, ACC sent Archer a letter saying that ACC anticipated that its expenditures would reach the performance bond's penal sum by November 16, 2012. (Dkt. 79-12 at 2). ACC's letter advised Archer that it should "mak[e] preparations to take whatever steps it believes are reasonable and prudent [and] . . . that under **no circumstances will [ACC] expend monies in excess of the bond penalty."** *Id*. (emphasis original). On November 13, 2012, ACC sent Archer another letter reaffirming its prior statement that the performance bond's penal sum would be exhausted by November 16, 2012. (Dkt. 79-13 at 2). Additionally, the letter stated that "ACC rejects any contention that the bond penalty has not - or will not shortly - be exhausted." *Id*. On November 19, 2012, ACC walked off the project. (Dkt. 79-14 at 13). At this point, ACC's expert estimates that the subcontract was 94.1% complete. (Dkt. 79-15 at 37).

The parties dispute the quality of ACC's performance prior to ACC's leaving the project and the propriety of costs charged against the penal sum. Archer's expert opines that ACC should have been able to complete the subcontract without exhausting the penal sum, the fault for ACC's failure to do so rests with ACC, and that ACC attributed improper costs against the penal sum. (Dkt. 79-14 at 14-15). As an example Archer points out that Ronald Dmytriw, who served as the on-site supervisor for Fasano during ACC's performance, flew back and forth to his home in Cleveland each weekend. (Dkt. 84-1 at 78:15-23, 114:3-4; Dkt. 84-2 at 50:7-51:2). This caused ACC to incur expenses for Dmytriw's flights, his travel time, his hotel stays in

---

[5]Although the exact time line is not clear, it appears that ACC began performing the remaining obligations under the subcontract almost immediately upon Archer's declaration of United's default. (Dkt. 79-14 at 16). Between Archer's declaration of United's default and entry into the Takeover Agreement, ACC provided some interim financial assistance to United. (Dkt. 40-1 ¶ 10; Dkt. 40-5).

Tampa, and other related costs that were either entirely or partially counted against the penal sum. (Dkt. 84-1 at 80:18-81:13, 126:14-25; Dkt. 84-2 at 51:3-17). Archer's expert opines that these costs totaled approximately $90,000 and would not have been incurred had ACC utilized local project management. (Dkt. 79-14 at 20).

Additionally, Archer's expert finds fault with ACC's utilization of IWES to complete the subcontract. IWES was hired on a time and material basis, in which IWES was paid at an hourly rate for labor and materials. (Dkt. 79-14 at 14; Dkt. 84-1 at 118:11-24; Dkt. 84-2 at 42:7-43:43:21). ACC had received a bid from another subcontractor on a lump sum basis. (Dkt. 84-1 at 101:19-102:1; DKt. 84-2 at 37:23-41:7). Archer's expert opines that ACC's election to use IWES on a time and material basis as opposed to accepting the bid of the other subcontractor on a lump sum basis greatly increased ACC's cost of performance. (Dkt. 79-14 at 20). Additionally, Archer's expert opines that IWES performed deficient work, which caused delays and required IWES to expend extra hours to repair its deficient work and that these costs were billed to ACC. *Id*. at 20-21.

ACC's expert disagrees and opines that ACC's expenditures were "reasonable and allocable to the Project and were incurred in performing the work required under the United Subcontract." (Dkt. 79-15 at 8). ACC's expert also contends that during performance of the subcontract, ACC encountered "severe disruptions, inefficiencies, and delays" beyond its control, including major design changes to the project. *Id*. at 37, 42-43. These disruptions caused ACC to incur additional costs. *Id*.

After ACC ceased performance, Archer evaluated the project's status and determined that a portion of the subcontract had yet to be completed and that some of the work performed by

United and/or ACC was deficient. (Dkt. 85-5 at 187:14-188:2). Archer retained another subcontractor and directly hired additional employees to complete the work and repair the allegedly deficient work. (Dkt. 79-14 at 13; Dkt. 85-5 at 187:21-188:2, 195:5-11, 197:19-198:5). Archer's expert opines that Archer's cost to correct the defective work and complete the subcontract was approximately $1,125,000. (Dkt. 79-14 at 24).

E. Indemnity Litigation in the Orlando Division

In March 2012, ACC filed suit in the Orlando Division of the Middle District of Florida to recover costs it had paid out on the performance bond.[6] The basis for the Orlando litigation was an indemnity agreement that ACC executed with United, Clarambeau, Clarambeau's wife, and a third-party (collectively, "the Indemnitors") prior to issuing the performance bond to United. (Orl. Dkt. 1-2 at 4). The indemnity agreement was a "condition precedent" to ACC issuing surety bonds to United and provided that the Indemnitors would reimburse ACC for any funds expended under the performance bond. (Orl. Dkt. 1 ¶ 13; Orl. Dkt. 1-2 at 4). After the Indemnitors failed to file any response to ACC's complaint, the Orlando litigation resulted in a default judgment in the amount of approximately $1,855,000  for ACC. (Orl. Dkt.40).[7]

F. Pending Litigation

---

[6]The original suit was filed under case number 6:12-cv-457-ACC-GJK.  In July 2012, this litigation was dismissed without prejudice for want of prosecution. ACC then refiled the same litigation in the Orlando Division in September 2012 under case number 6:12-cv-1363-CEH-KRS. (Orl. Dkt. 1). Citations to "Orl. Dkt." refer to the latter case number.

[7]Under Local Rule 1.04(d), "[a]ll counsel of record in any case have a continuing duty promptly to inform the Court . . . of any similar or related case or proceeding pending before any other court." Under ACC's notice of pendency of related actions, ACC did not disclose the case arising from the indemnity agreement that was then pending in the Orlando Division. (Dkt. 6). Given the relationship between these cases and the potential effect of one upon the other, ACC ought to have included the Orlando Division case in its notice in this case.

In November 2012, Archer filed suit against ACC in state court. ACC removed the state court case to this Court on January 15, 2013. (Related. DKt. 1).[8] On January 14, 2013, ACC filed suit against Archer in this Court. (Dkt. 1). On June 14, 2013, the Court consolidated the two cases. (Dkt. 27).

In its amended complaint, ACC asserts five claims against Archer: (1) declaratory judgment that the performance bond is null and void; (2) rescission of the performance bond; (3) unjust enrichment of Archer because ACC's expenditures were made pursuant to a now voided or rescinded bond; (4) intentional misrepresentation based on Archer's fraudulent statements and omissions; and (5) breach of the Takeover Agreement. (Dkt. 8). Additionally, ACC asserts a claim against Archer's sureties on the VA project, Liberty Mutual and Travelers, to recover ACC's contributions to the project. *Id.* In its amended answer, Archer asserts a counterclaim against ACC for breach of its obligations under the performance bond and under the Takeover Agreement. (Dkt. 96).

On June 2, 2014, the parties each filed motions for summary judgment. (Dkt. 79; Dkt. 82). Archer seeks summary judgment on ACC's declaratory judgment, rescission, unjust enrichment, intentional misrepresentation, and breach of contract claims. (Dkt. 79). ACC seeks summary judgment on Archer's counterclaim and on its own declaratory judgment, rescission, and unjust enrichment claims. (Dkt. 82). Alternatively, ACC seeks summary judgment on its fraudulent misrepresentation claim. *Id.*

---

[8]Upon removal, the case was assigned to a different judge of this Court but later transferred to the undersigned. (Related Dkt. 15). Citations to the related docket are to Archer's suit against ACC, following removal, under case number 8:13-cv-00141-T-35TGW prior to its transfer and consolidation.

### III.    ARCHER'S COUNTERCLAIM–ACC'S MOTION FOR SUMMARY JUDGMENT

In its counterclaim, Archer asserts that ACC breached the performance bond and the Takeover Agreement by performing poor quality work, failing to complete United's obligations, and charging unreasonable or otherwise improper costs against the performance bond's penal sum. (Dkt. 96 at 7-10). ACC asserts that it is entitled to summary judgment on Archer's counterclaim because: (1) the performance bond should be voided or rescinded and thus cannot form the basis for Archer's counterclaim; and (2) ACC has already expended funds in excess of the performance bond's penal sum, which is the limit of its liability. (Dkt. 82 at 2, 16-24). Because in a separate part of this order the Court finds that Archer is entitled to summary judgment on ACC's claims that the performance bond should be voided or rescinded, the Court only addresses here ACC's argument that it exhausted the penal sum which is the limit of its liability.

In response to ACC's penal sum argument, Archer contends: (1) a performing surety's liability is not capped at the bond's penal sum; (2) the Takeover Agreement is not supported by consideration and is therefore unenforceable; (3) the Takeover Agreement is ambiguous as to the extent of ACC's liability; and (4) even if ACC's liability is capped at the penal sum, genuine issues of material fact exist as to whether ACC actually exhausted the penal sum. (Dkt. 97 at 11-20).

A. Whether a Performing Surety's Liability is Capped at the Penal Sum

ACC contends that its liability is capped at the performance bond's penal sum, while Archer contends that a penal sum does not serve as a cap on a surety's liability when the surety undertakes performance of the principal's obligations.

A surety's liability "is limited to the amount of the penalty named in the bond." *Travelers Indem. Co. v. Askew*, 280 So. 2d 469, 471 (Fla. 1st DCA 1973). As the parties recognize, some courts in other jurisdictions have held that "[w]hen a surety elects to directly undertake performance of a principal's obligations, the surety's liability is no longer limited by the amount of the bond." *Employers Mut. Cas. Co. v. United Fire & Cas. Co.*, 682 N.W.2d 452, 457 (Iowa Ct. App. 2004).[9]  For example, in a case cited by both parties, a court explains:

> [T]here is a distinction in liability between, on the one hand, those cases in which the surety takes over completion of the contract by stepping into the shoes of the contractor—in which case the surety's liability is equal to what the contractor's liability would be—and, on the other hand, those cases in which the surety chooses simply to "pay off" its obligation to the obligee (or deny liability), in which case its liability is generally limited to the penal sum of the bond.

*Int'l Fid. Ins. Co. v. Cnty. of Rockland*, 98 F. Supp. 2d 400, 428 (S.D.N.Y. 2000). Given the surety's potential exposure to liability in excess of the penal sum, that court went on to explain that "[t]o avoid liability in excess of the bond amount, . . . the surety must include a clause in the takeover agreement which limits the surety's liability in the course of performance to the original bond penalty." *Rockland*, 98 F. Supp. 2d at 429 (internal quotation marks omitted); *see also Deluxe Bldg. Sys., Inc. v. Constructamax, Inc.*, 2:06-CV-02996 KM MAH, 2013 WL 4781017, at *4 (D.N.J. Sept. 5, 2013) ("A surety that takes over a project is still free to negotiate contractual mechanisms to protect itself.").

---

[9]The rule has not gained universal acceptance. *E.g.People ex rel. Ryan v. Envtl. Waste Res., Inc.*, 335 Ill. App. 3d 751, 757, 782 N.E.2d 291, 296 (2002).

The parties cite, and the Court's research reveals, no Florida cases addressing whether a performing surety's liability can exceed the bond's penal sum, and if so, whether a performing surety can still limit its liability by so providing in a contract with the obligee. In these situations, a federal court "decide[s] novel questions of state law the way it appears the state's highest court would." *Freeman v. First Union Nat.*, 329 F.3d 1231, 1232-33 (11th Cir. 2003) (internal quotation marks and citations omitted).

Under Florida law, "contracts of surety are regarded as analogous to contracts of insurance, and are to be strictly construed against the surety and in favor of the obligee." *Gulf Power Co. v. Ins. Co. of N. Am.*, 445 So. 2d 1141, 1142 (Fla. 1st DCA 1984). However, the Florida Supreme Court has stated that a "surety's liability for damages is limited by the terms of the bond . . . [and] the liability of a surety should not be extended by implication beyond the terms of the contract." *Am. Home Assur. Co. v. Larkin Gen. Hosp., Ltd.*, 593 So. 2d 195 (Fla. 1992) (citation omitted); *see also Gato v. Warrington*, 37 Fla. 542, 548, 19 So. 883 (1896) ("[T]he liability of a surety is not to be extended, by implication, beyond the terms of his contract; and to the extent, in the manner, and under the circumstances pointed out in his undertaking he is bound, and no further."). Additionally the Florida Supreme Court has noted:

> A bond is a contract, and, therefore, a bond is subject to the general law of contracts. The intent of the parties to the contract should govern the construction of a contract. To determine the intent of the parties, a court should consider the language in the contract, the subject matter of the contract, and the object and purpose of the contract.

*Larkin*, 593 So. 2d at 197 (citations omitted). Surety contracts are analogous to insurance contracts, *Gulf Power*, 445 So. 2d at 1142, and "[u]nder Florida law, insurance contracts are construed according to their plain meaning," *Philadelphia Indem. Ins. Co. v. Yachtman's Inn*

Page 21

*Condo Ass'n, Inc.*, 595 F. Supp. 2d 1319, 1323 (S.D. Fla. 2009) (internal quotation marks

omitted). Thus, "[w]here the policy's language is plain and unambiguous, there is no special

construction or interpretation required, and the plain language of the policy will be given the

meaning it clearly expresses." *Id*. (internal quotation marks omitted).

    Thus, while Florida courts generally construe surety agreements against the surety, a

surety's liability should not be extended by implication and general principles of contract law

remain applicable. Additionally, even courts that have found that a performing surety can be

exposed to liability beyond the bond's penal sum have noted that a surety can expressly disclaim

such exposure in a takeover agreement. *Cnty. of Rockland*, 98 F. Supp. 2d at 428-29;

*Constructamax*, 2013 WL 4781017, at *4. The Takeover Agreement in the instant case clearly

provides that ACC's liability is "limited to and shall not exceed the penal sum" and that

"[n]othing in this Agreement constitutes a waiver of such penal sum or an increase in the liability

of the Surety." (Dkt. 40-6 at 4). Accordingly, the Court finds that even if a performing surety's

liability can exceed the penal sum, a performing surety can limit its liability by expressly so

providing in a contract with the benefitted obligee. ACC did so here, and the Court therefore

finds that ACC's liability is capped at the penal sum.

    B. Whether the Takeover Agreement is Supported by Consideration

    Even if ACC *could* have limited its liability to the performance bond's penal sum in the

Takeover Agreement, Archer contends that the Takeover Agreement was not supported by

consideration and is therefore unenforceable. Archer argues that in the Takeover Agreement,

ACC only agreed to perform obligations it was already required to perform under the

performance bond. (Dkt. 97 at 14-16). Under Florida law, "[t]he performance of a pre-existing

duty does not amount to the consideration necessary to support a contract." *Slattery v. Wells Fargo Armored Serv. Corp.*, 366 So. 2d 157, 159 (Fla. 3d DCA 1979). However, "a promise, no matter how slight, can constitute sufficient consideration so long as a party agrees to do something that they are not bound to do." *Ashby v. Ashby*, 651 So. 2d 246, 247 (Fla. 4th DCA 1995).

Under the performance bond, ACC had several options upon United's default, including providing United with financing to finish the subcontract, directly completing the subcontract, or tendering the penal sum to Archer. (Dkt. 1 at 17-18).[10] In the Takeover Agreement, ACC committed itself to directly perform the subcontract. (Dkt. 40-6 at 2). Furthermore, the performance bond provides that Archer could have undertaken performance of United's remaining obligations and sought reimbursement from ACC. (Dkt. 1 at 18). The Takeover Agreement "acknowledges that the Surety . . . is acting in its capacity as the surety for [United] in making arrangements for the performance and completion of the Original Contract." *Id.* Thus, ACC, by electing direct performance from amongst its various options under the performance bond, and Archer, by foregoing its ability to directly perform the subcontract and seek reimbursement, "agree[d] to do something that they [were] not bound to do." *Ashby*, 651 So. 2d at 247. Accordingly, the Court finds that the Takeover Agreement was supported by consideration.

C. Whether the Takeover Agreement is Ambiguous

---

[10]Indeed, Archer originally notified ACC that Archer would "proceed to begin performing the balance of Untied's subcontract work . . . with an alternative subcontractor." (Dkt. 82-2 at 20). It is unclear whether this resulted in Archer performing any work prior to ACC's takeover of the project.

Archer contends that the Takeover Agreement is ambiguous as to the extent of ACC's liability. (Dkt. 97 at 16-17). The Takeover Agreement provides that ACC "hereby undertakes to cause the performance of each and every one of the terms, covenants, and conditions of the Original Contract" and that "[t]he Surety shall complete the work required under the Original Contract pursuant to this Agreement in accordance with the terms and conditions of the Original Contract and the Bond." (Dkt. 40-6 at 2-3). The Takeover Agreement also provides that "[t]he total liability of the Surety under this Agreement and the Performance Bond for the performance of the work is limited to and shall not exceed the penal sum . . . as defined in the Performance Bond" and that "[n]othing in this Agreement constitutes a waiver of such penal sum or an increase in the liability of the Surety." (Dkt. 40-6 at 4).

First, Archer contends that the performance provisions and the penal sum provisions conflict with one another because ACC promised to complete the subcontract work while simultaneously attempting to limit the maximum funds it would have to expend in doing so. (Dkt. 92 at 16). Secondly, Archer contends that the penal sum provisions are inherently ambiguous because the provisions do not specify that the limitation of liability is made with respect to ACC's completion of the subcontract work. (Dkt. 97 at 16-17).

Under Florida law, a "court should reach a contract interpretation consistent with reason, probability, and the practical aspect of the transaction between the parties." *Whitley v. Royal Trails Prop. Owners' Ass'n, Inc.*, 910 So. 2d 381, 383 (Fla. 5th DCA 2005). As noted above, general principles of contract law apply to surety agreements, *Larkin*, 593 So. 2d at 197, and a "contract should be reviewed *as a whole* and all language given effect." *Leisure Resorts, Inc. v. City of W. Palm Beach*, 864 So. 2d 1163, 1166 (Fla. 4th DCA 2003) (emphasis added).

Page 24

The Court finds that there is no conflict in the language of the Takeover Agreement, and that ACC agreed to directly perform the subcontract to the extent of the penal sum. The purported ambiguities advanced by Archer would render the penal sum language of the Takeover Agreement meaningless. Archer's interpretation directly conflicts with the plain language of the Takeover Agreement, which provides that ACC's liability is "limited to and shall not exceed the penal sum." (Dkt. 40-6 at 4). Furthermore, given that some courts have found that a performing surety can be liable beyond the penal sum, the limitation of liability in the Takeover Agreement is "consistent with reason, probability, and the practical aspect of the transaction between the parties." *Whitley*, 910 So. 2d at 383.

Finally, the Takeover Agreement provides that "[ACC] hereby undertakes to cause the performance of each and every one of the terms . . . [of the subcontract], and agrees that to the extent *agreed upon under the terms of the Bond it is* bound by the [subcontract]." (Dkt. 40-6 at 2) (emphasis added). Additionally, the Takeover Agreement states that ACC "is not assuming any obligations or liabilities beyond those set forth in the Bond." *Id.* The performance bond provides that ACC's "liability shall not exceed, in the aggregate, the penal sum." (Dkt. 1 at 19).

The Takeover Agreement itself and the performance bond, which is referenced in the Takeover Agreement, expressly provide that ACC's liability will not exceed the penal sum. Accordingly, the Court finds that the Takeover Agreement contains no ambiguity and requires ACC to perform the subcontract up to the penal sum.

D. Whether ACC's Expenditures Exceeded the Penal Sum

Even if ACC's liability is capped at the penal sum, Archer contends that ACC's expenditures did not exceed the penal sum. The Takeover Agreement provides that "[a]ll

payments properly made by the Surety for the proper performance of the Original Contract for work completed after the Declaration, shall be credited against the penal sum of the Performance Bond." (Dkt. 40-6 at 4). One clause in the recitals sections of the Takeover Agreement states, "WHEREAS: the Former Contractor was declared by the Owner to be in default on its performance of the Original Contract on September 2, 2011 ('Declaration')." *Id.*[11] Thus, the Takeover Agreement defines "Declaration" as September 2, 2011, the date on which Archer declared United in default. (Dkt. 40-6 at 2; Dkt. 82-2 at 23).

Based on this language, Archer asserts that: (1) only expenditures "properly made" for the "proper performance" of the subcontract can be charged against the penal sum, and (2) in any case, only costs accrued after September 2, 2011 can be charged against the penal sum. (Dkt. 79 at 16-17). ACC does not specifically contest that only "proper" costs can be allocated against the penal sum.[12]

ACC does, however, contend that pre-default charges can be charged against the penal sum. (Dkt. 98 at 15, 18-19). Archer's expert opines that approximately $203,000 of ACC's costs are attributable to labor and material costs prior to United's default. *Id.* at 19. The Takeover Agreement provides that payments made by ACC "for work completed after the Declaration," which is defined as September 2, 2011, "shall be credited against the penal sum of the Performance Bond." (Dkt. 40-6 at 4). However, the Takeover Agreement does not provide that other costs cannot be credited against the penal sum. Accordingly, the Court finds that the

---

[11]The Takeover Agreement also provides that "[t]he parties . . . acknowledge the accuracy of the . . . recitals which are adopted and incorporated herein by reference and are made a part hereof." (Dkt. 40-6 at 2).

[12]For example, in its response to Archer's motion for summary judgment, ACC writes "[a]t [Archer]'s best, a genuine issue of material fact exists as to whether ACC's performance costs were 'proper' for the performance of the work." (Dkt . 98 at 15).

Takeover Agreement is unclear as to whether ACC can charge pre-default costs against the penal sum.

 As set out above in the Background section of this order, Archer's expert points to various unreasonable and excessive costs incurred by ACC during its performance of the subcontract, including: (1) utilization of IWES on a time and material basis rather than retaining a subcontractor on a lump sum basis, (2) costs related to Dmytriw's travel back and forth to Cleveland each weekend, and (3) costs related to the extra time needed to repair IWES' deficient work. (Dkt. 79-14 at 20). After accounting for the improper costs, Archer contends that ACC's "proper" expenditures did not in actuality exceed the penal sum. (Dkt. 79 at 16-17; Dkt. 97 at 17-20). Because only "proper" expenditures can be credited against the penal sum under the Takeover Agreement, Archer reasons that ACC's expenditures never reached the penal sum. (Dkt. 97 at 17-20). ACC's expert disagrees and opines that ACC's "payments were reasonable and allocable to the Project." (Dkt. 79-15 at 46).

Based on the conflicting opinions of the parties' experts, the Court concludes that genuine issues of material fact exist as to whether ACC exhausted or exceeded the penal sum. In addition, the Takeover Agreement is unclear as to whether pre-default costs can be charged against the penal sum.

E. Conclusion

The Court finds that: (1) ACC's liability is capped at the penal sum; (2) the Takeover Agreement between ACC and Archer is supported by consideration; (3) the Takeover Agreement unambiguously provides that ACC agreed to perform the subcontract up to the penal sum; and (4) genuine issues of material fact exist as to whether ACC exhausted or exceeded the penal sum.

Because genuine issues of material fact exist as to ACC's exhaustion of the penal sum, ACC is not entitled to summary judgment on Archer's counterclaim.

## IV.   ACC'S CLAIMS–ARCHER'S MOTION FOR SUMMARY JUDGMENT AND ACC'S MOTION FOR SUMMARY JUDGMENT

In its amended complaint, ACC seeks: (1) declaratory judgment that the performance bond is void, (2) rescission of the performance bond, (3) recovery in equity for unjust enrichment, (4) recovery in tort for intentional misrepresentation, (5) recovery in contract for breach of the Takeover Agreement, and (6) recovery against Archer's sureties. (Dkt. 8). Archer moves for summary judgment on ACC's declaratory judgment, rescission, unjust enrichment, intentional misrepresentation, and breach of contract claims. (Dkt. 79). ACC seeks summary judgment on its declaratory judgment, rescission, unjust enrichment, and intentional misrepresentation claims. (Dkt. 82).

A. ACC's Claim for Intentional Misrepresentation (Count IV)

Under Florida law, a claim for fraudulent misrepresentation has four elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and, (4) consequent injury by the party acting in reliance on the representation." *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985).

ACC's intentional misrepresentation claim is premised on Archer's affirmative statement in its response to the All Rights Letter and Archer's concealment and/or non-disclosure of the bid spread information. ACC contends that Archer fraudulently misrepresented material information by: (1) affirmatively stating that it did not possess any information indicating that United "would have any problem completing this job according to the plans and specifications,

on schedule, and paying all bills for which [United] is responsible"; and (2) omitting information in its possession regarding the disparity between United's bid and the other drywall bids received by Archer when the All Rights Letter specifically requested such information. Archer asserts that it did not misrepresent any material fact, and that even if so, ACC did not rely upon its misrepresentations. (Dkt. 79 at 10-15).

"A knowing concealment or non-disclosure of a material fact can support an action for fraud when there exists a duty to disclose the material information." *Artec Grp., Inc. v. Chugach Mgmt. Servs., Inc.*, 470 F. Supp. 2d 1353, 1356 (M.D. Fla. 2006) (citing *Friedman v. Am. Guardian Warranty Servs., Inc.*, 837 So. 2d 1165, 1166 (Fla. 4th DCA 2003)). Alternatively, "when a party voluntarily undertakes to disclose information, it must disclose all material facts." *Artec*, 470 F. Supp. 2d at 1356.

The parties cite none and research reveals no Florida Supreme Court decision regarding the scope of a would-be obligee's duty to respond fully and accurately to the questions of an inquiring would-be surety.[13] "If the state's highest court has not ruled on the issue, a federal court must look to the intermediate state appellate courts." *Veale v. Citibank, F.S.B.*, 85 F.3d 577, 580 (11th Cir. 1996). The Florida First District Court of Appeal in *Lambert v. Heaton* explained:

> [I]t is the rule that if with the knowledge . . . of the creditor any material part of the transaction between the creditor and his debtor is misrepresented to the surety, the misrepresentation being such that but for the same having taken place either the suretyship would not have been entered into at all, or, being entered into, the extent of the surety's liability might thereby be increased, the surety so given is void at law, on the ground of fraud. And if facts material to the surety are concealed by the obligee when it is his duty to disclose them, his motive in concealing is immaterial.

---

[13] ACC wrongly cites the case of *Lambert v. Heaton* as a Florida Supreme Court decision. (Dkt. 82 at 11).

134 So. 2d 536, 539 (Fla. 1st DCA 1961). *Lambert*'s language implies on the part of an obligee a

duty to disclose material information to potential sureties seeking information about a would-be

principal's financial condition. Additionally, *Lambert*'s language is consistent with common law

principles of suretyship that while an obligee is generally "under no obligation, legal or moral, to

search for the surety, and warn him of the danger of the step he is about to take," *Magee v.

Manhattan Life Ins. Co.*, 92 U.S. 93, 99-100, 23 L. Ed. 699 (1875), a potential surety's questions

to a would-be obligee "must be candidly and truthfully answered," *Sherman v. Harbin*, 125 Iowa

174, 100 N.W. 629, 631 (1904).

Archer had a duty to truthfully answer ACC's questions regarding United. Archer

responded to ACC's inquires regarding United's financial condition and ability to perform the

subcontract when it completed the All Rights Letter and forwarded it to ACC. (Dkt. 79-4; Dkt.

82-2 at 3). Archer employees explain that they understood the form All Rights Letter as

requesting information about the bid spread. (Dkt. 85-5 at 77:22-78:5, 83:1-12, 91:7-10, 99:21-

100:2). However, they did not include it. Moon, Archer's project manager who signed Archer's

October 14, 2010 response letter, explained that the omission of the paragraph regarding the bid

spread was intentional so as not to include untruthful information in Archer's response. (Dkt. 85-

5 at 82:13-19). In addition to not disclosing the bid spread, Archer affirmatively stated that it was

"in possession of no facts or information, at this time, which would lead us to believe that

[United] would have any problems completing this job according to the plans and specifications,

on schedule and paying all bills." Archer contends that this statement is not a statement of fact

but only expresses its opinion as to United's future ability to perform.

Under Florida law, "in order to be actionable[,] a fraudulent misrepresentation must be of

a material fact, rather than a mere opinion." *Chino Elec., Inc. v. U.S. Fid. & Guar. Co.*, 578 So.

2d 320, 323 (Fla. 3d DCA 1991). This is because "people . . . are generally expected to deal at

arms' length with one another-which means that in the normal business transaction a person

should not rely on such ephemeral matters as an opposing party's opinions, . . . but instead

should rely on more substantial matters, namely, the opposing party's representations of fact

which are material to the transaction." *Id.* Additionally:

> An action for fraud generally may not be predicated on statements of
> opinion or promises of future action, but rather must be based on a
> statement concerning a past or existing fact. However, . . . [w]here the
> person expressing the opinion is one having superior knowledge of the
> subject of the statement and the plaintiff can show that said person
> knew or should have known from facts in his or her possession that the
> statement was false, then the opinion may be treated as a statement of
> fact.

*Mejia v. Jurich*, 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001).

However, the Court agrees with ACC that Archer's statement in its October 14, 2010

response that it was "in possession of no information that would lead Acher to believe United

would be unable to complete the job" is a statement of fact rather than a mere opinion. If Archer

was indeed in possession of such information at the time it drafted its response, then Archer's

statement would be a false statement of material fact. For example, Panozzo's email stated that

United's cash flow and working capital were "very weak,"and it is undisputed that Archer knew

of the disparity between Untied's bid and the next lowest bid. (Dkt. 82-2 at 27). ACC contends

that a wide bid spread can indicate that a subcontractor underbid the job, which in turn, means

that the subcontractor's cash flow will be insufficient to cover its bills. (Dkt. 97-3 ¶ 9).

Archer next argues that even if the Court were to find that there was a representation of

material fact, ACC did not rely on the misrepresentation in issuing the performance bond. First,

Archer contends that ACC had superior knowledge of United's financial situation and relied on

that superior knowledge in issuing the performance bond. (Dkt. 79 at 6; DKt. 97 at 6).

Specifically, Archer points out that ACC had United's financial statements from December 2009

and June 2010, while Archer only had the December 2009 financial statement. (79-2 at 6, 19).

Archer asserts that the more recent financial statement illustrates an improved picture for United.

(Dkt. 79 at 6). ACC responds that even with this information, it could not connect the dots about

United's financial situation because Archer failed to disclose information related to the bid

spread. (Dkt. 98 at 11-12). ACC explains that a subcontractor with a weak financial condition

can complete a properly bid job by using its cash flow from the job to pay its bills. (Dkt. 98-3 ¶

9). However, when the job is underbid, the subcontractor's cash flow will be insufficient to cover

its bills. *Id*. Thus, ACC explains that to the extent it had knowledge of United's precarious

financial situation, such knowledge would not independently put ACC on notice that United

would be unable to perform the subcontract absent accompanying knowledge of United's

underbid. (Dkt. 98 at 11-12). Parrish, the ACC employee primarily involved in underwriting

United's performance bond, and Zareski, Parrish's superior who ultimately granted approval,

both assert that ACC would not have issued the performance bond had it known of the bid

spread. (Dkt. 98-2 ¶ 8;  Dkt. 98-3 ¶ 10).

Next, Archer contends that ACC recognized that Archer did not provide the requested

information regarding the bid spread and yet ACC never followed up with Archer regarding the

omission. (Dkt. 79 at 5). ACC acknowledges that it recognized that Archer's response to the

requested All Rights Letter did not include the paragraph regarding the bid spread despite the

fact that ACC had requested such information, and ACC admits that it never sought to clarify the

omission with Archer. (Dkt. 87-2 at 77:20-24, 79:8-11). ACC explains that it understood

Archer's statement in the letter that Archer was "in possession of no facts or information . . .

which would lead [Archer] to believe that [United] would have any problems completing this

job" as subsuming the requested bid spread information. (Dkt. 84-1 at 26:1-21). Accordingly,

despite the omission, ACC asserts that it understood Archer's letter as representing that United's

bid was in line, and it relied on this understanding in issuing the performance bond. (Dkt. 98-3 ¶¶ 8, 11).

Third , Archer points out that Parrish's email to Zareski recommending issuance of the performance bond states that ACC was "still awaiting . . . the . . . All Rights Letter." (Dkt. 79-2 at 33). Therefore, Archer contends that Parrish, who was ACC's primary employee involved in the underwriting process, recommended approval before reading Archer's response to the requested All Rights Letter and thus could not have relied on it. (Dkt. 79 at 4; Dkt. 97 at 5-6; Dkt. 98-2 ¶1). ACC responds that Parrish's indication that ACC was awaiting the All Rights Letter demonstrates that ACC would not issue the performance bond prior to its receipt. (Dkt. 98 at 7). Zareski, who ultimately approved issuance of the bond, explains that he understood Parrish's email as indicating that Parrish's request for approval was conditioned upon receipt and review of Archer's response to the All Rights Letter. (Dkt. 98-3 ¶¶ 4, 7). Finally, Zareski's reply to Parrish's email, sent days before the performance bond was issued, specifically discussed Archer's response to the All Rights Letter; thus, even if Parrish recommended approval before reading the All Rights Letter, the evidence establishes that Zareski, the ultimate decision-maker, reviewed the letter before granting approval. (Dkt. 98-3 ¶ 4).

Finally, Archer contends that ACC, as opposed to relying on Archer's representations, knowingly assumed the risk with respect to United's ability to perform the subcontract. (Dkt. 79 at 15). Archer asserts that this assumption of risk is consistent with ACC's participation in the non-standard surety bond market and ACC's representation on its website that ACC "provides bonds to contractors who would not otherwise qualify for standard surety credit." (Dkt. 79 at 15; Dkt. 79-1 at 17). ACC disputes that participation in the non-standard surety bond market equates with a conclusion that ACC knowingly issues risky bonds. (Dkt. 98 at 4). At his deposition, Parrish was asked whether ACC underwrites "riskier files" and responded "that's your

terminology for it" without specifically agreeing or disagreeing. (Dkt. 97-2 at 40:9-12). ACC explains that a surety utilizes enhanced protections, such as collateral and escrow accounts, when issuing non-standard bonds. (Dkt. 98-3 ¶ 5).

A plaintiff pursuing a fraudulent misrepresentation claim must establish an injury "acting in reliance on the representation." *Johnson*, 480 So. 2d at 627. However, "[j]ustifiable reliance is not a necessary element of fraudulent misrepresentation," which "prohibit[s] one who purposely uses false information to induce another into a transaction from profiting from such wrongdoing." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010). However, although "justifiable" reliance is not necessary for a fraudulent misrepresentation claim, the Florida Supreme Court has explained that "where one has an opportunity to make a cursory examination or investigation and does not do so, he cannot recover." *M/I Schottenstein Homes, Inc. v. Azam*, 813 So. 2d 91, 93 (Fla. 2002).

Based on the factual disputes addressed above, genuine issues of material fact exist as to whether ACC actually relied on Archer's representations or omissions, in deciding whether to issue the performance bond to United. While Archer insinuates that any reliance by ACC was misguided in light of the information known to ACC, ACC does not need to establish justifiable reliance with respect to its fraudulent misrepresentation claim. *Butler*, 44 So. 3d at 105. Accordingly, neither party is entitled to summary judgment on ACC's intentional misrepresentation claim.

B. ACC Claims for Declaratory Judgment, Rescission, and Unjust Enrichment (Counts I, II, and III)

In Count I, ACC seeks a declaration from the Court that the performance bond is void due to Archer's failure to disclose facts indicating that United could not perform the subcontract. In Count II, ACC seeks to rescind the performance bond for the same reason. (Dkt. 8 at 7-10). In

Count III, ACC asserts that Archer has been unjustly enriched because the bond is void, and any expenditures by ACC under the performance bond or Takeover Agreement constitute the unjust enrichment of Archer. (Dkt. 8 at 10-11; Dkt. 109 at 1).

1. Declaratory Judgment

The purpose served by declaratory judgment is "the clarification of legal duties for the future, rather than the past harm a coercive tort action is aimed at redressing." *AmSouth Bank v. Dale*, 386 F.3d 763, 786 (6th Cir. 2004). First, ACC's pursuit of a fraudulent misrepresentation claim demonstrates that "other legal relief is immediately available." *X Corp*, 622 So. 2d at 1100. Secondly, ACC attempts to use a declaratory judgment action to enable it to void the performance bond, under which it has already performed. ACC could have sought a declaratory judgment regarding the validity of the performance bond to prospectively limit its liability at the time it was called on to perform the subcontract. Under Florida law, "[a]n insurer may file a declaratory action in order to determine whether an insurance policy is voidable," and "[a] declaratory action is an appropriate means by which to determine the issue of coverage." *Transp. Cas. Ins. Co. v. Soil Tech Distributors, Inc.*, 966 So. 2d 8, 10 (Fla. 4th DCA 2007). However, ACC is not attempting to prospectively clarify its rights and obligations under the performance bond but rather to recover for past harm resulting from Archer's misrepresentations.  ACC's declaratory judgment claim is an inappropriate vehicle for the relief it seeks.  Accordingly the Court finds that Archer is entitled to summary judgment on ACC's declaratory judgment claim.

2. Rescission

Rescission is an equitable remedy, which "lies within the sound discretion of the court and is not available as a matter of right." *Gov't of Aruba v. Sanchez*, 216 F. Supp. 2d 1320, 1365

(S.D. Fla. 2002). Additionally, "[rescission and cancellation are harsh remedies and therefore not favored by the courts." *Rood Co. v. Bd. of Pub. Instruction of Dade Cnty.*, 102 So. 2d 139, 142 (Fla. 1958).

Rescission restores the status quo, returning the individual to the position he was in before a transaction occurred.  Thus "a party who rescinds an agreement must place the opposite party in status quo, and where restoration is impossible, a contract cannot be rescinded." *Lang v. Horne*, 156 Fla. 605, 615, 23 So. 2d 848, 853 (1945) (citation omitted). Relatedly, a "party's right to rescind is subject to waiver if he retains the benefits of a contract after discovering the grounds for recession." *Mazzoni Farmers, Inc v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 313 (Fla. 2000).

Archer contends that rescission is unavailable to ACC because: (1) ACC never provided Archer with notice of rescission, (2) ACC waived its ability to rescind, (3) the parties cannot be restored to the status quo as necessary to support a rescission claim, and (4) rescission is unavailable where monetary relief provides the requested relief. (Dkt. 79 at 15-16; Dkt. 97 at 9-10; Dkt. 105 at 6). The Court concludes that rescission is not an available remedy for several reasons.

First, "a fundamental requirement necessary for rescission of a contract is that the moving party has no adequate remedy at law." *Collier v. Boney*, 525 So. 2d 971, 972 (Fla. 1st DCA 1988). Under its intentional misrepresentation claim, ACC asserts that it relied upon Archer's misrepresentations in issuing the performance bond and seeks recovery for its resulting damages. Under its rescission claim, ACC seeks recovery for its performance of the subcontract under the performance bond and the Takeover Agreement. These damages would fold into ACC's intentional misrepresentation damages since ACC's issuance of the bond led to execution of the Takeover Agreement and its performance of the subcontract. Accordingly, the Court finds

that ACC has an adequate remedy at law. *See Hall v. Burger King Corp.*, 912 F. Supp. 1509, 1530 (S.D. Fla. 1995) (finding that a plaintiff's "own complaint demonstrates . . . an adequate remedy at law" when the plaintiff asserts that the "false statements . . . [that] warrant . . . rescission . . . are precisely the same false statements which allegedly form the basis of their fraud claim").

When rescinding an insurance policy, Florida law requires that "[t]he insurer must place the insured back in the same position the insured was in before the effective date of the policy through the return of the premium." *Gonzalez v. Eagle Ins. Co.*, 948 So. 2d 1, 3 (Fla. 3d DCA 2006). Although not entirely clear from the record, it appears that United paid bond premiums to secure the performance bond from ACC. *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 338 (6th Cir. 2007) (explaining that "the principal pays the premium"). There is no evidence to suggest that ACC returned the premiums to United even though they suggest they will return the premium paid for the Bond in their complaint. However, the Court is doubtful that this is possible, considering that ACC currently has a $1,885,000 default judgment against United in the Orlando indemnity litigation. (Orl. Dkt. 39). Given the equitable nature of rescission and the Court's doubtful ability to restore the parties to their preexisting condition, the Court finds rescission is not an available remedy.

In sum, the Court declines to exercise its discretion in permitting rescission of the performance bond under the facts and circumstances of this case, and accordingly finds that Archer is entitled to summary judgment on ACC's rescission claim.

### 3. Unjust Enrichment

In its amended complaint, ACC alleges that "[t]he misrepresentation or concealment of material facts by [Archer] renders the Bond null and void . . . [and as] a result, ACC had no obligation to confer any benefit on [Archer] or perform any work at the Project." (Dkt. 8 at 10-

11). ACC reasons that any performance of the subcontract constitutes an unjust enrichment of Archer absent an enforceable performance bond or Takeover Agreement. Thus, ACC's unjust enrichment claim is predicated upon its declaratory judgment and rescission claims. Given that the Court grants summary judgment to Archer on these claims, it follows that Archer is entitled to summary judgment on ACC's unjust enrichment claim.[14]

C. ACC's Claim for Breach of the Takeover Agreement (Count V)

In the alternative to its declaratory judgment and rescission claims, ACC asserts a breach of contract claim based on Archer's breach of the Takeover Agreement. (Dkt. 8 at 12-13). Although ACC's theory of contract liability is somewhat unclear, it appears that ACC contends that Archer breached the Takeover Agreement in three ways: (1) by causing ACC to incur unnecessary costs during ACC's performance of the subcontract; (2) by not paying ACC the remaining balance of the subcontract; and (3) by not reimbursing ACC for its expenditures in excess of the penal sum.

1. Causing ACC to Incur Unnecessary Costs

In its response to Archer's motion for summary judgment, ACC describes this component of its breach of contract claim:

> ACC asserts a breach of contract claim against [Archer] for the damages ACC suffered during its takeover and performance of the Project. ACC incurred costs far beyond what was necessary to complete the Project as a direct result of delays, inefficiencies and other impacts caused by [Archer]'s mismanagement of the Project.

---

[14]In a two sentence argument, Archer also contends that an unjust enrichment claim is inappropriate in light of the contractual relationship between the parties. (Dkt. 79 at 24)."[W]here there is an express contract between the parties, claims arising out of that contractual relationship will not support a claim for unjust enrichment." *Moynet v. Courtois*, 8 So. 3d 377, 379 (Fla. 3d DCA 2009). However, this rule does not apply "where one of the parties asserts that the contract governing the dispute is invalid," *Degutis v. Fin. Freedom, LLC*, 978 F. Supp. 2d 1243, 1265 (M.D. Fla. 2013). Given that ACC alleges that no valid agreement exists, the Court does not rely upon this argument in granting summary judgment.

(Dkt. 98 at 1). First, the Court notes that this theory of liability does not appear in ACC's amended complaint as a basis for recovery under its breach of contract claim. (Dkt. 8 at 12-13). Secondly, even assuming that Archer caused ACC to incur unnecessary costs,[15] it is unclear how such costs breached the Takeover Agreement. ACC does not point to which provision of the Takeover Agreement Archer actually breached by causing ACC to incur unnecessary costs. While ACC may be able to charge these costs against the penal sum, ACC points to no basis for recovery of these costs in contract. Accordingly, Archer is entitled to summary judgment on this component of ACC's breach of contract claim.

### 2. Failure to Pay ACC Remaining Subcontract Balance

In its amended complaint, ACC alleges that "[Archer] has breached the Takeover Agreement by not paying to ACC the remaining contract balances of the United Subcontract." (Dkt. 8 at 13). The Takeover Agreement provides that Archer "agrees that the Contract Balance is dedicated to and will be applied to the completion of the Original Contract" and that Archer "shall pay directly to the Surety progress and final payments pursuant to the terms of the Original Contract." (Dkt. 40-6 at 3). ACC's expert opines that Archer failed to pay the full balance of the contract. (Dkt. 79-15 at 41).

Although this is included as part of ACC's breach of contract claim in its amended complaint and although Archer moves for summary judgment on ACC's breach of contract claim, neither party devoted any argument in their respective summary judgment motions or responses to Archer's alleged failure to pay the remaining subcontract balance. It is unclear whether ACC intends to continue pursuing this as a basis of contract liability. In any case, the

---

[15]ACC's expert opines that ACC incurred increased costs due to "impacts beyond the control of United/ACC . . . [that] were attributable to Owner changes, design errors and omissions, and problems due to other subcontractors." (Dkt. 79-15 at 7).

amended complaint does allege that the failure to pay the full subcontract balance constitutes a breach of contract, and the burden for summary judgment rests with Archer. *Cline* , 434 F. App'x at 824. Archer has not satisfied its burden.

### 3. Failure to Reimburse ACC for Expenditures in Excess of the Penal Sum

The Takeover Agreement provides that "[t]he total liability of the Surety under this Agreement and the Performance Bond for the performance of the work is limited to and shall not exceed the penal sum . . . as defined in the Performance Bond" and that "[n]othing in this Agreement constitutes a waiver of such penal sum or an increase in the liability of the Surety." (Dkt. 8 at 12-13; Dkt. 40-6 at 4). ACC relies on this language in asserting that Archer breached the Takeover Agreement by not reimbursing ACC for ACC's expenditures over the penal sum.

Archer contends, and the Court agrees, that the Takeover Agreement does not create a contractual obligation for Archer to reimburse ACC if ACC's expenditures exceeded the penal sum. (Dkt. 79 at 7, 23-24).[16] As noted above, the Takeover Agreement clearly limits ACC's liability to the penal sum, and thus, ACC could have relied on the terms of the Takeover Agreement in declining to spend more than the penal sum in performing the subcontract. This is exactly what ACC did: ACC sent Archer a letter prior to leaving the project indicating that "the bond penalty . . . will be exhausted in the upcoming week" and that "under no circumstances will the Surety expend monies in excess of the bond penalty." (Dkt. 79-12 at 2) (emphasis omitted).

However, while the Takeover Agreement limits ACC's liability to the penal sum, it does not provide that Archer is required to reimburse ACC for any of ACC's expenditures exceeding the penal sum. ACC's claim is premised on implying a contractual obligation out of the penal

---

[16]Archer also raises several other arguments with respect to ACC's ability to recover costs spent in excess of the penal sum. (Dkt. 79 at 18-23). Because the Court agrees with Archer that there is no basis to recover these costs in contract, the Court does not address these arguments.

sum language, but when interpreting a contract, "the plain meaning of the actual language used by the parties controls," *Pol v. Pol*, 705 So. 2d 51, 53 (Fla. 3d DCA 1997), and "a court is powerless to rewrite the contract" even if doing so would "make it more reasonable or advantageous for one of the contracting parties, *Emergency Associates of Tampa, P.A. v. Sassano*, 664 So. 2d 1000, 1003 (Fla. 2nd DCA 1995). There is no language in the Takeover Agreement that makes Archer liable for ACC's excess expenditures, and there is accordingly no basis in contract for ACC to recover these costs.

### 4. Conclusion

Archer is entitled to summary judgment to the extent that ACC's breach of the Takeover Agreement claim is based on: (1) costs allegedly caused by Archer's mismanagement of the project, or (2) ACC's expenditures in excess of the penal sum. Archer is not entitled to summary judgment to the extent that ACC's claim is based on Archer's failure to pay the remaining subcontract balance.

## V.      MOTION TO STRIKE

Archer asks the Court to strike the affidavit of Matthew Silverstein. (Dkt. 95). In the challenged affidavit, Silverstein asserts that ACC relied upon Archer's misrepresentations and that ACC's expenditures exceeded the penal sum by approximately $435,000. (Dkt. 82-4 ¶¶ 7, 15-16). Archer contends that Silverstein's comments regarding ACC's underwriting process do not reflect his personal knowledge and that his calculation of ACC's expenditures over the penal sum conflict with an early affidavit.[17] (Dkt. 95). The Court notes that the challenged statements in Silverstein's affidavit were largely corroborated by other record evidence. In any case, the

---

[17]Silverstein submitted an affidavit with ACC's first motion for summary judgment, which has since been withdrawn. (Dkt. 39; Dkt. 40-1). In that affidavit, Silverstein stated that ACC's expenditures exceeded the penal sum by only $307,000. (Dkt. 40-1 ¶ 12). Silverstein attributes the revised calculation to review of discovery and further analysis. (Dkt. 82-4 ¶ 16).

Court did not rely upon the challenged statements in its adjudication of the parties' cross-motions for summary judgment, and Archer's motion to strike is therefore due to be denied as moot.

## VI.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Archer's motion for summary judgment (Dkt. 79) is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to Counts I, II, and III of ACC's amended complaint and as to Count V of the amended complaint to the extent ACC's breach of contract claim is premised on recovery of its costs exceeding the penal sum and costs caused by Archer's mismanagement of the project. The motion is **DENIED** as to Counts IV and VI of ACC's amended complaint and as to Count V of the amended complaint to the extent that ACC's breach of contract claim is premised on recovery of unpaid portions of the subcontract balance.

2. ACC's motion for summary judgment (Dkt. 82) is **GRANTED IN PART** and **DENIED IN PART.**  With respect to Archer's counterclaim, the motion is **GRANTED** to the extent that ACC's liability is limited to the performance bond's penal sum and **DENIED** as to whether ACC actually exhausted the performance bond's penal sum. With respect to its own claims, ACC's motion is **DENIED.**

3. Archer's Motion to Strike Affidavit of Matthew Silverstein (Dkt. 95) is **DENIED AS MOOT.**

4. This case remains set for a non-jury trial on the Court's October 2014 trial calendar with a pretrial conference scheduled on September 16, 2014 at 8:30 AM. The parties are reminded that a joint pretrial statement is due no later than September 11, 2014.

**DONE AND ORDERED** at Tampa, Florida, this 21st day of August, 2014.

Copies to:
Counsel of record

SUSAN C. BUCKLEW
United States District Judge